MASSACHUSETTS ORGANIZATION OF STATE ENGINEERS
AND SCIENTISTS *vs.* LABOR RELATIONS COMMISSION.

Suffolk. May 2, 1983. — August 15, 1983.

Present: HENNESSEY, C.J., LIACOS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Commonwealth,* Collective bargaining. *Labor,* Collective bargaining,
Duty to bargain. *Contract,* Collective bargaining contract.

The Labor Relations Commission did not err, as matter of law, in con-
cluding that an impasse had been reached in negotiations between the
Commonwealth's Office of Employee Relations and the collective bar-
gaining representative of certain State employees, even though fact-
finding procedures pursuant to G. L. c. 150E, § 9, were incomplete,
and in determining that, consequently, the Office of Employee Rela-
tions could lawfully issue unilateral changes in work rules affecting the
employees. [923-928]

APPEALS from decisions of the Labor Relations Com-
mission.

After review was sought in the Appeals Court, the Su-
preme Judicial Court ordered direct appellate review on its
own initiative.

*Nathan S. Paven* for Massachusetts Organization of State
Engineers and Scientists.

*John B. Cochran* for Labor Relations Commission.

*Sandra C. Quinn,* for Massachusetts Teachers Association,
amicus curiae, submitted a brief.

NOLAN, J. Two cases are consolidated here for appeal. In
the first case, the plaintiff, Massachusetts Organization of
State Engineers and Scientists (MOSES or the union), ap-
peals from the decision of the Labor Relations Commission
(commission) that the Commonwealth of Massachusetts Of-
fice of Employee Relations (Commonwealth), a public em-
ployer, did not violate its duty to participate in good faith in
fact-finding when it instituted unilateral changes in work
rules before completion of fact-finding. In the second case,

389 Mass. 920                                                921

Massachusetts Org. of State Eng'rs & Scientists v. Labor Relations Commission.

MOSES appeals from the commission's dismissal of complaints whereby MOSES alleged that the Commonwealth had refused to arbitrate certain disputes and to bargain concerning the effect of layoffs of certain employees. The appeals were originally filed in the Appeals Court pursuant to G. L. c. 150E, § 11, as amended through St. 1981, c. 351, § 245, and consolidated there. We then transferred the cases here on our own motion. We find no error in either case.

The issues are essentially questions of law. For that reason we will recite only those facts found by the commission that are necessary to frame properly the issues. MOSES and the Commonwealth were parties to a collective bargaining agreement which ran from July 1, 1977, through June 30, 1980. Article 29 of that document provided that "[s]hould a successor agreement not be executed by July 1, 1980, this Agreement shall remain in full force and effect until a successor agreement is executed or an impasse in negotiations is reached." Although negotiations began in April, 1980,[1] no successor agreement was executed by July 1, 1980. The parties continued negotiations informally. On August 6, MOSES petitioned the Board of Conciliation and Arbitration (board) for mediation pursuant to G. L. c. 150E, § 9. Walter Diehl, the mediator appointed by the board, presided over a number of meetings between the parties but negotiations were stalemated. On September 16, Diehl declared an impasse and certified the matter for fact-finding under § 9. On October 20, the board appointed Robert M. O'Brien as fact-finder.[2]

---

[1] Unless otherwise noted, all dates hereinafter refer to the year 1980.

[2] Prior to that appointment but after certification, the parties resumed informal discussions. According to the testimony of Paul Donohue, a union negotiator, the parties reached an "agreement in principle on all the issues" but the agreement was not implemented because it was not approved by the Secretary of Administration and Finance for the Commonwealth, who had final say on the matter for the Commonwealth. According to the Commonwealth's chief negotiator, Donn Berry, the Commonwealth made no movement during the informal meetings and he informed MOSES that their "proposal" would not "fly" although he presented it to the Secretary at the union's request. By letter dated November 4, Berry

On November 17, Diehl presided over a meeting between the parties. The Commonwealth presented Diehl with a number of "work rules" which Diehl then conveyed to MOSES. These "work rules," some of which were to go into effect that day, limited the rights which union representatives had previously enjoyed under the contract to attend collective bargaining sessions and other related proceedings without loss of pay, and they modified language in certain articles of the contract.[3] MOSES conceded at oral argument that the changes brought about in the "work rules" were in conformance with the Commonwealth's previous bargaining stance.[4]

Sometime after the November 17 meeting, MOSES submitted to Diehl "an alternative economic offer." It is unclear whether Diehl ever conveyed this offer to the Commonwealth. In any event, nothing came of it. Fact-finding began on December 29.

MOSES brought charges against the Commonwealth in January, 1981, for its failure to bargain and to participate in good faith in fact-finding as required by G. L. c. 150E, § 10 (*a*)(5) & (6). Following investigation, the commission issued a complaint. After a hearing, a majority of the three-member commission panel ruled that the unilateral changes were lawful because impasse had been reached. One panel member dissented. MOSES timely appealed.

In February, 1981, the Commonwealth announced its decision to lay off employees in the Department of Public

notified Donohue that the union's proposal was unacceptable to the Commonwealth and he suggested that the parties continue negotiations while awaiting fact-finding.

[3] These modifications are not relevant here.

[4] By letter dated December 9, Berry informed MOSES of certain changes relating to "standby" duty which the Commonwealth intended to put into effect on December 21. At the union's request, the parties met to discuss these changes and, as a result, the Commonwealth modified its proposed changes substantially in conformance with the union's concerns. The new changes were to take effect on January 4, 1981. The Commonwealth invited the union to bargain over the matter before and after implementation, but the union did not respond.

389 Mass. 920                              923

Massachusetts Org. of State Eng'rs & Scientists v. Labor Relations Commission.

Health (DPH). MOSES filed a grievance contending that the Commonwealth had used incorrect seniority credits in determining which employees were to be laid off. Unsuccessful in the grievance procedure, MOSES requested arbitration. The Commonwealth refused on the ground that there was no arbitration agreement in effect between the parties.

In June, 1981, according to plans developed by the State and Federal governments, other employees of the DPH were to be transferred to the Executive Office of Human Services (EOHS). MOSES requested EOHS to bargain concerning the impact of these transfers on the seniority rights of its members. Although meetings between the parties were held, no bargaining took place and the transfers became final in July, 1981.

MOSES brought charges in June, 1981, against the Commonwealth before the commission for the Commonwealth's refusal to arbitrate the layoffs and to bargain concerning the transfers. After a hearing in September, 1981, the commission's panel unanimously ruled that the Commonwealth's duty to arbitrate and to bargain expired when it had bargained to impasse. MOSES timely appealed.

1. *The unilateral changes.* MOSES contends that the commission's decision upholding the unilateral changes is wrong as a matter of law because the decision was based on a misinterpretation of the Commonwealth's obligation to bargain collectively and to participate in good faith in fact-finding under G. L. c. 150E, § 10 (a)(5) & (6). MOSES argues that the statutorily-sanctioned fact-finding procedures are an integral part of the public sector negotiating process and that, therefore, an impasse which would permit a public employer to initiate unilateral changes cannot legally occur prior to the completion of fact-finding. In essence, MOSES' position is that the Commonwealth's implementation of unilateral changes prior to the completion of fact-finding represented a per se violation of its obligation

under G. L. c. 150E, § 10 (*a*) (5) & (6).[5]  MOSES acknowledges that a private sector employer may implement unilateral changes after impasse, see *NLRB* v. *Katz*, 369 U.S. 736, 741-742 (1962), but asserts that a public employer should not be allowed to do so, as a matter of policy, for it would then hold an unfair economic advantage over public employees who, unlike their private sector counterparts, are forbidden by law to strike.  See G. L. c. 150E, § 9A.

The issue raised here concerns the legal effect of the fact-finding procedures established by G. L. c. 150E, § 9, upon the Commonwealth's obligation under § 10 (*a*) (5) & (6).[6] This is essentially a question of statutory interpretation. There can be no doubt that "[t]he duty of statutory interpretation is for the courts." *Cleary* v. *Cardullo's, Inc.*, 347 Mass. 337, 344 (1964).  However, we are constrained by statute to "give due weight to the experience, technical competence, and specialized knowledge of the agency," G. L. c. 30A, § 14, as amended through St. 1976, c. 411.  In addition, ordinary precepts of statutory construction instruct us to accord deference to an administrative interpretation of a statute. *School Comm. of Wellesley* v. *Labor Relations Comm'n*, 376 Mass. 112, 116 (1978).  Application of these principles is especially significant "where, as here, an agency must interpret a legislative policy which is only broadly set out in the governing statute." *School Comm. of Springfield* v. *Board of Educ.*, 362 Mass. 417, 442 (1972).

There is nothing in any of the relevant statutes which would specifically allow or prohibit the Commonwealth's

---

[5] General Laws c. 150E, § 10, inserted by St. 1973, c. 1078, § 2, provides in pertinent part:

"(*a*) It shall be a prohibited practice for a public employer or its designated representative to:

"(5) Refuse to bargain collectively in good faith with the exclusive representative as required in section six;

"(6) Refuse to participate in good faith in the mediation, fact-finding, and arbitration procedures set forth in sections eight and nine."

[6] We noted, but did not reach, this question in *Southern Worcester County Regional Vocational School Dist.* v. *Labor Relations Comm'n*, 377 Mass. 897, 904 (1979).

389 Mass. 920                                                    925

Massachusetts Org. of State Eng'rs & Scientists *v*. Labor Relations Commission.

implementation of unilateral changes prior to the completion of fact-finding. We have examined the legislative history of the relevant statutes and we find it to be inconclusive.[7] In this context, we turn to the commission's interpretation and application of the statute.

[7] In a brief submitted as amicus curiae, the Massachusetts Teachers Association (MTA) makes much of the Legislature's substitution of language from earlier proposed versions of G. L. c. 150E, § 9, which allowed either party to "take whatever lawful actions it deems necessary to end the dispute, provided that no action shall involve the disruption or interruption of public services," 1973 House Doc. No. 6194, at 22, with language requiring that the dispute be resubmitted to the parties for further bargaining in the event that mediation and fact-finding fail to resolve the impasse. The MTA views this substitution as evidence of the Legislature's intent to prohibit either party from resorting to self-help as a method of impasse resolution. The MTA asserts that: "[I]t is irrational to assume that the Legislators would . . . withdraw as potent a right as a public employee union's right to strike without a quid pro quo to offer to their constituents in the public sector. That quid pro quo was the removal . . . of the presumptive right of the employer to utilize self-help prior to exhaustion of impasse procedures."

None of the proposed bills either specifically permitted or restricted the public employer's right to implement unilateral changes after impasse, although the prohibition against the public employee union's right to strike, once established, was expressly stated. Contrary to the MTA's assertions, we think it equally likely, as a matter of statutory construction, that the Legislature's explicit reference to the employer's right to strike and its silence as to any reciprocal obligation on the part of the employer is evidence that the Legislature intended no such quid pro quo. See *Wasco County* v. *American Fed'n of State, County & Mun. Employees*, 30 Or. App. 863, 865 (1977), after remand, 46 Or. App. 859 (1980). We note that the Legislature has, in G. L. c. 150E, § 10, specifically delimited prohibited practices for a public employer without reference to unilateral changes. Moreover, to say that, because an unresolved dispute is ultimately to be resubmitted to the parties for further bargaining, the parties, therefore, may not resort to self-help is to beg the question. The question is not whether the parties have a good faith duty to bargain or to participate in fact-finding but whether the public employer's implementation of unilateral charges in the instant circumstances is a violation of that duty.

The MTA's further argument that the Legislature intended to withdraw from the commission jurisdiction to determine impasse is wholly unpersuasive. G. L. c. 150E, § 11, specifically requires the commission to "state its findings of fact" after hearing a complaint of prohibited practice. The commission has also made clear that it views the board's determination of impasse under G. L. c. 150E, § 9, as independent of the commission's determination whether an impasse justifying unilateral change has occurred. *Commonwealth of Mass.*, 8 M.L.C. 1499, 1512 (1981).

Relying on *NLRB* v. *Katz*, 369 U.S. 736 (1962), the commission adopted, as early as 1974, the general rule that "an employer may not lawfully change the wages, hours, or working conditions of his organized workers without negotiating with their union," in cases involving public employers. *Town of North Andover*, 1 M.L.C. 1103, 1106 (1974). See also *Town of Marblehead*, 1 M.L.C. 1141, 1144-1145 (1974); *Boston School Comm.*, 3 M.L.C. 1603, 1605 (1977). In *City of Boston*, 3 M.L.C. 1450 (1977), the commission ruled that the city of Boston had violated its obligation to negotiate in good faith when it unilaterally changed its policy of allowing representatives of the policemen's and the firefighters' unions time off with pay for union business. In that case, however, the policemen's union had indicated its willingness to reopen negotiations after impasse had been declared and the city had not previously proposed eliminating time off to the firefighters' union. The commission, in dictum, noted that "[t]he National Labor Relations Board and the Courts have held that, where a legitimate impasse exists, the employer may make unilateral changes in working conditions. But, those cases emphasize that the change[s] must be consistent with the employer's bargaining position" (footnote omitted). *Id.* at 1463.

The question whether a public employer could implement unilateral changes during impasse was squarely presented to the commission in *Hanson School Comm.*, 5 M.L.C. 1671 (1979). There, the Hanson school committee unilaterally abolished a twelve-month guidance counselor's position and then recreated the position on a ten-month basis. The action was taken during mediation sessions three months prior to the expiration of the collective bargaining agreement between the parties. The mediator had made no formal declaration of impasse. The commission held that the unilateral change was justified because the bargaining history of the case demonstrated that the parties had reached impasse on that issue. The commission noted that although the existence of a legitimate impasse merely suspended, but did not terminate, a party's obligation to bargain in good faith,

"[a]fter good faith negotiations have exhausted the prospects of concluding an agreement, an employer may implement unilateral changes which are reasonably comprehended within its pre-impasse proposals." *Id.* at 1675-1676.

It is evident from these, as well as subsequent, decisions of the commission, see e.g., *Commonwealth of Mass.*, 8 M.L.C. 1499, 1512 (1981); *New Bedford School Comm.*, 8 M.L.C. 1472, 1477 (1981), that the commission has consistently applied principles derived from private sector bargaining cases to cases in this Commonwealth involving public employers where the issue was the legitimacy of unilateral changes after impasse. It is clear that the commission is not unmindful of the unique nature of the employer-employee relationship in the public sector. See *City of Lawrence*, 3 M.L.C. 1304, 1308 (1976) ("The obligation to resume negotiations after impasse is perhaps greater in the public sector, where the union is prohibited from striking even after a deadlock has been reached");[8] *Lenox School Comm.*, 7 M.L.C. 1761, 1776 (1980) ("[C]ases arising under the NLRA are helpful in interpreting c. 150E although we must be mindful of differences between the statutes and the public and private sectors"). The commission has also, in other contexts, discussed the applicability of principles derived from the private sector to the resolution of disputes in the public sector. See *Town of Danvers*, 3 M.L.C. 1559, 1570-1573 (1977) (discussion of policy considerations of applying private sector principles to define scope of public sector bargaining obligations); *Southeastern Regional School Dist. Comm.*, 7 M.L.C. 1801, 1807-1808 (1981) (comparative analysis of right to strike in public and private sectors).

In the instant case, the commission noted that because the matter must be resubmitted to the parties if the impasse continues after publication of the fact-finder's report, the logical extension of MOSES' argument would be that a pub-

---

[8] We note that public employees are not without economic weapons of their own although they are prohibited from striking. See, e.g., *Lenox School Comm.*, 7 M.L.C. 1761 (1980) (commission upheld public employee "work-to-rule" job actions against challenges by the public employer).

lic employer could not implement unilateral changes even after the completion of fact-finding. The commission considered this untenable. The commission also noted that the Legislature drew considerable guidance from the National Labor Relations Act, 29 U.S.C. §§ 151-169 (1976 & Supp. 1981), when it drafted G. L. c. 150E, and that if the Legislature had intended to reject Federal precedent in this area it would have done so explicitly. Finally, the commission reviewed decisions of the United States Supreme Court, lower Federal courts, and the National Labor Relations Board holding, in effect, that a party's use of economic weapons to resolve a labor impasse was not inconsistent with a good faith willingness to bargain and reach settlement. In these circumstances, we cannot say that the commission was wrong, either as a matter of law or as public policy, in its interpretation of the Commonwealth's duty to bargain and participate in fact-finding after impasse. Cf. *School Comm. of Wellesley* v. *Labor Relations Comm'n*, 376 Mass. 112 (1978). Indeed, in our recent decision in *School Comm. of Newton* v. *Labor Relations Comm'n*, 388 Mass. 557 (1983), we stated the rule that "[i]n the absence of impasse, unilateral action by an employer concerning mandatory subjects of bargaining violates the duty to bargain in good faith." *Id.* at 574. We think that the implication of this language, that unilateral action during the existence of a legitimate impasse is not a per se violation of the duty to bargain in good faith, foreshadows our holding today.[9]

---

[9] The dissenting member of the commission in the instant case cited a number of cases from labor commissions in other jurisdictions for the proposition that "the duty to bargain in good faith prohibits an employer from changing conditions of employment when the parties are engaged in good faith in fact finding or mediation." We do not know whether those cases involved a determination of impasse, however. Of the two cases relied upon by the union for the proposition that unilateral changes pending fact-finding should be prohibited, *Wasco County* v. *American Fed'n of State, County & Mun. Employees*, 30 Or. App. 863 (1977), after remand, 46 Or. App. 859 (1980); *Triborough Bridge & Tunnel Auth.*, 5 PERB § 3037 (N.Y. 1972), only the former involved a determination of impasse. Contrast *Association of N.J. State College Faculties, Inc.* v. *Board of Higher Educ.*, 112 N.J. Super. 237 (1970). Although the commission

*2. The refusal to arbitrate and bargain.* MOSES' argument on this issue hinges on the legal validity of the commission's finding of impasse. MOSES does not argue that the Commonwealth's duty to arbitrate and bargain would extend beyond the finding of legitimate impasse. Because we have concluded that the commission's finding of impasse was not improper as a matter of law, we affirm the decision of the commission on this point.

The decisions of the commission entered on March 22, 1982, and May 4, 1982, are affirmed.

*So ordered.*

---

would have been free to consider cases from other jurisdictions in making its decision, it was not required to adopt the reasoning or interpretation of another administrative agency based on a materially different statute. We note that in Pennsylvania a public employer is by statute free to implement unilateral changes reasonably comprehended within its previous bargaining stance after good faith bargaining to impasse. See Decker, Pennsylvania's Public Employee Relations Act (Act 195) and Impasse — The Public Employer's Right to Make Unilateral Changes in Employment Conditions, 86 Dick. L. Rev. 1 (1981).