## MURRY G. SIMON & others[1] *vs.* STATE EXAMINERS OF ELECTRICIANS.

Suffolk.   December 17, 1982. — April 23, 1984.

Present: PERRETTA, ROSE, & DREBEN, JJ.

*Alarm Systems. Electricians. Regulation. Administrative Law,* Regulations, Agency's interpretation of statute. *Statute,* Construction.

A regulation of the State Examiners of Electricians requiring that all electrical work on fire and burglar alarm systems be performed by licensed electricians was validly adopted under G. L. c. 141, § 1. [21-26] ROSE, J., dissenting.

General Laws c. 141, § 7, which provides that "companies incorporated for the transmission of intelligence by electricity" shall not be subject to regulation under c. 141, afforded no exemption to a group of plaintiffs engaged in the business of installing and maintaining alarm systems. [27-28]

CIVIL ACTION commenced in the Superior Court on March 10, 1975.

The case was heard by *Hayeck,* J., a District Court judge sitting under statutory authority.

*John P. Graceffa,* Assistant Attorney General, for the defendant.

*Anne L. Berger (Judith A. Kelley* with her) for the plaintiffs.

*Peter J. Gagne,* for Electrical Contractors Association of Greater Boston, amicus curiae, submitted a brief.

[1] American District Telegraph Company, Andrew J. Crotty, Jr., Fred Tapper (installers and maintainers of burglar, fire and smoke alarm systems for commercial and residential properties); the Massachusetts Alarm Association, Inc. (an organization formed "to promote uniform standards for the burglar, fire and smoke alarm industry and to offer assistance and advice to the public in such matters"); and the Massachusetts Security Contractors Association (a nonprofit corporation engaged in improving business conditions of those persons involved in installing and maintaining burglar, fire, and smoke alarm systems).

PERRETTA, J. The plaintiffs, a group of individuals, corporations, and trade unions involved in the business of installing, maintaining, and servicing burglar and fire alarm systems within the Commonwealth, brought an action in the Superior Court as a direct judicial challenge (see G. L. c. 30A, and G. L. c. 231A) to Rule 2.2 of the Rules and Regulations of the Board of State Examiners of Electricians of the Commonwealth of Massachusetts (1974) (board). See now 237 Code Mass. Regs. 4.02(3) (1981). That rule requires that only licensed electricians "engag[e] in or work[ ] at the business of installing wires, conduits, apparatus, fixtures or other appliances for carrying or using electricity for light, heat, or power purposes, fire alarm and all signal work requiring the use of wire for transmission."

The plaintiffs contend: (1) that they are outside the scope of the licensing requirements set forth in G. L. c. 141, § 1, because their systems are not for "light, heat or power purposes" and such requirements cannot be enlarged by the board through use of its rulemaking authority; and (2) that because alarm systems convey information, installation of such systems is exempt from the board's regulation by reason of G. L. c. 141, § 7, a section providing that c. 141, § 1, is inapplicable to the "work of companies incorporated for the transmission of intelligence by electricity."

The trial judge concluded that § 1 was not applicable to the plaintiffs and that, even if it were, the plaintiffs would be exempt from its coverage by § 7. A judgment entered declaring that the regulation "is invalid in its application to each of the plaintiffs" and permanently enjoining the board from enforcing, civilly or criminally (see G. L. c. 141, § 5), the regulation against any of the plaintiffs.

We conclude that the regulation is valid, that it is consistent with the purpose of § 1, and that the plaintiffs are not within the scope of the exemption claimed under § 7. We do not, however, determine the applicability of the regulation to the individual plaintiffs because the record is inadequate for such purpose.

I. FACTS.

A stipulation of agreed facts was filed by the parties and incorporated by the trial judge in his findings of fact. The parties also presented three witnesses, but the trial judge made no additional findings based upon their testimony.

General Laws c. 141, § 1, as amended by St. 1943, c. 308, provides, in pertinent part:

> "No person, firm or corporation shall enter into, engage in, or work at the business of installing wires, conduits, apparatus, fixtures or other appliances for carrying or using electricity for light, heat or power purposes, unless such person, firm or corporation shall have received a license and a certificate therefor, issued by the state examiners of electricians and in accordance with the provisions hereinafter set forth."

Pursuant to its rule making authority under § 2 of the statute,[2] the board promulgated the disputed regulation, which substantially tracks the language of § 1, with the major exception of the emphasized additional phrase:

> "All persons, firms and corporations entering into, engaging in or working at the business of installing wires, conduits, apparatus, fixtures or other appliances for carrying or using electricity for light, heat, or power purposes, *fire alarm and all signal work requiring the use of wire for transmission,* within the Commonwealth of Massachusetts shall be governed by the applicable provisions, now or hereafter in force, of all general and special laws; all rules and regulations made and promulgated pursuant to the provisions of any such law; and in respect to all matters not therein expressly provided shall be governed by the standards set forth in the 1981 Massachusetts

---

[2] General Laws c. 141, § 2, provides in pertinent part that "[t]he state examiners of electricians, in this chapter called the examiners, may make necessary rules for the proper performance of their duties."

Electrical Code, 527 CMR: 12.00 and as may be from time to time amended, for Electrical Wiring and Apparatus as Rules and Requirements for Electrical Wiring in Massachusetts as adopted by this Board on June 22, 1981."

With these provisions in mind, we turn to the facts set out in the parties' stipulation. "All modern burglar alarm systems and approximately fifty percent of all fire alarm systems are connected to a *power* supply by means of a plug-in transformer. The remaining systems are hard wired to a *power* supply but, when hard wiring is necessary, it is done by a licensed electrician" (emphasis supplied).

There are attached to the stipulation excerpts, including a diagram, from Hahn, Modern Electronic Security Systems (1976), which the stipulation states "fairly describe the essential elements and functions of a typical burglar alarm system." A second attachment to the stipulation is a hand drawn diagram (of unidentified origin) labelled "Typical Fire Alarm System," which the parties stipulate "fairly represents the essential elements and functions of a typical fire alarm system."[3] There are also, according to the undisputed testimony in the record,

---

[3] It appears from these attachments to the stipulation that a "typical burglar alarm system" consists of the following: a control unit connected to a power supply and standby power supply, the former connected to a 120 volt (AC) "Input"; "space detectors," "perimeter detectors," and "remote key switch stations," having the capability of transmitting signals over wire into the "security control" unit; a "local alarm bell" or "local alarm siren" which can be activated by signals over wire from the "security control" unit; and a "reversing telephone relay," "automatic telephone dialer," or "McCulloh Circuit," having the capability of placing a telephone call to an answering service or control security station when activated by signals over wire from the "security control unit."

A "typical fire alarm system" appears to function in a substantially similar manner. A control unit connects to a power source (115 Volts AC or "Plug In Transformer output twelve volts"); various smoke detectors, thermostats, and "manual pull stations," having the capability of transmitting signals over wire into a "Fire Alarm Control" unit; and horns or sirens which can be activated by signals over wire from the control unit. The control unit also has the capacity to transmit an alarm signal over wire to a central alarm station, city fire department, or "master box."

more sophisticated fire alarm systems which can perform various mechanical functions, such as automatically operating elevators or reversing ventilation systems to expel smoke from a building.

Collectively, the plaintiffs install all of the described systems. Their argument is that they do not fall within the licensing requirements of G. L. c. 141, § 1, because their alarm systems do not use electricity for purposes of the end products of light, heat, or power. Although the alarm systems, according to the parties' stipulation, draw upon electricity to supply power to the systems, the plaintiffs contend that they are outside the scope of G. L. c. 141, § 1, because: "Burglar, fire and smoke alarms do not have heat or light as a purpose. . . . Nor is power an end product, as the signals given out by alarm equipment are not power." They contend that to bring their activities within the control of the board is to enlarge the scope of § 1, which must be done by legislative, rather than rule making, authority.

The board argues that the statutory phrase "light, heat or power" is inclusive and general and does not refer to "end-products." It contends that the alarm systems utilize electricity for power purposes and that, therefore, the systems must be installed by licensed electricians.[4]

II. THE STATUTE.

The board's interpretation of c. 141, § 1, as giving it the authority to require licensed electricians to install burglar and fire alarms is entitled to "respect." *White Dove, Inc.* v. *Director of the Div. of Marine Fisheries,* 380 Mass. 471, 477 (1980). "Although the usefulness of regulations should not be overrated, their importance is never greater than where, as here, an agency must interpret a legislative policy which is only broadly set out in the governing statute." *School Comm. of Springfield* v. *Board of Educ.,* 362 Mass. 417, 442 (1972). See

---

[4] The board has been joined in its position by the Electrical Contractors Association of Greater Boston (association). A single justice of this court granted the association leave to file a brief as an amicus curiae. Mass.R.A.P. 17, 365 Mass. 864 (1974).

also *Consolidated Cigar Corp.* v. *Department of Pub. Health,* 372 Mass. 844, 850 (1977); *Massachusetts Organization of State Engineers & Scientists* v. *Labor Relations Commn.,* 389 Mass. 920, 924 (1983).

Since the meaning of the term "power" is not immediately apparent, we must construe the phrase "light, heat or power purposes," in light of the history of the statute, which dates from St. 1915, c. 296, and its relation to other statutes touching upon the same subject matter. See generally *Commonwealth* v. *Welosky,* 276 Mass. 398, 403 (1931); *McCarthy* v. *Rogers,* 295 Mass. 245, 249 (1936); *Nichols* v. *Commissioner of Corps. & Taxn.,* 314 Mass. 285, 291 (1943). The obvious intent of the Legislature in enacting what is now c. 141, § 1, has been, since 1915, to require that electrical work be performed by licensed electricians. See *Maria* v. *State Examiners of Electricians,* 365 Mass. 551, 554 (1974).

We do not think it consistent with that intent to read "light, heat or power purposes" as words of limitation. Rather, we view them as a shorthand expression for the most common uses of electricity at the time of the statute's enactment. Interpretations of the words "light, heat or power" as used in 1915 support this conclusion. The term "power" was construed broadly in *Commissioner of Corps. & Taxn.* v. *Springfield,* 321 Mass. 31 (1947). In that case the court made clear, at least for purposes of construing a 1916 corporate franchise tax statute, that the distribution of electricity for purposes of power included furnishing electricity "for such purposes as operating a radio, a toaster, a refrigerator or some other household article." *Id.* at 37.[5] A 1913 legislative report issued pursuant to a

---

[5] In rejecting an argument by the Commissioner of Corporations and Taxation that two companies "incorporated for the purpose of furnishing light and power by electricity and heat" were power and not electric light companies within the meaning of the relevant statute, the court pointed out that nothing appeared in the report accompanying the original statute or in the 1916 statute itself, "indicating that an electric light company which sold electricity for power was not to be regarded as an electric light company. It was a matter of common knowledge that electric light companies were furnishing electricity for power; and although the amounts furnished for this purpose have greatly increased, especially with reference to ordinary

resolution to revise the laws of the Commonwealth pertaining to the manufacture and transmission of gas and electricity again shows a broad use of the term "power" and that the words "light," "heat" and "power" were used interchangeably with the term "electricity." The report pointed out that some statutes referred to sale of gas and electricity for "light and heat," some for "light, heat or power," some spoke of sale of "electric light," others of "electricity." 1913 House Doc. No. 1925, at 13. After citing the "lack of uniformity" in the array of statutes, the report explained that "electric light and electric power" companies were not defined, that both classes of companies sold electricity, and stated, "'Light,' 'heat,' and 'power'" as used in the statutes "are but varied manifestations of the same thing. Its identity is not affected by the use which the purchaser may perhaps make of it." *Id.* at 14.[6]

We thus conclude from these contemporaneous interpretations of the words "light, heat, or power," that although they are arguably redundant when viewed with the hindsight of tech-

---

household equipment, so that it is highly improbable that there is a single electric light company furnishing electricity for illumination which does not also furnish electricity for such purposes as operating a radio, a toaster, a refrigerator or some other household article, and although [the statute] has been amended, . . . the phrase 'electric light . . . companies' has remained unchanged, and this must be taken to mean that the Legislature was satisfied that this phrase included a company that was distributing electric energy not only for the purpose of *illumination* but also for *power*." *Commissioner of Corps. & Taxn.* v. *Springfield,* 321 Mass. at 37 (emphasis supplied).

[6] We are not unmindful that G. L. c. 166, § 30, first adopted in 1890 (see St. 1890, c. 404, § 1), speaks in terms of wires designed to carry "light and power current" (later to include heat, see St. 1899, c. 337, § 1) and wires not so designed. The nature of any distinction existing in c. 166, § 30, and its historical predecessors, however, becomes apparent, in our view, in R. L. c. 122, §§ 1 through 30 (1902), and it is not based upon wires carrying light, heat and power and wires carrying "other" electrical products. Rather, the distinction rests on whether the wires were installed by electrical companies or telephone and telegraph companies. See also G. L. c. 166, §§ 21, 22A, and 25. Nor is there anything in G. L. c. 143 which detracts from our analysis. As we read that chapter, although telephone and telegraph company employees need not be licensed electricians under G. L. c. 141, § 1, by reason of § 7 of that chapter, we see nothing in G. L. c. 143 which exempts such company employees from compliance with the electrical code promulgated under G. L. c. 143, § 3L.

nological advancement,[7] they were just different ways of phrasing the common uses of electricity.

The fact that the board did not promulgate the present regulation until 1974 does not, in our view, minimize the weight to be given the board's interpretation of § 1. See *Federal Trade Commn.* v. *Bunte Bros.,* 312 U.S. 349, 352 (1941). We think it inappropriate to infer that the board's nonaction between 1915 and 1974 was the result of a deliberate interpretation of § 1 in a manner contrary to that taken in 1974. It is equally plausible that the 1974 regulation was a "carefully considered interpretation," issued in response to the circumstances supported in the record, namely that alarm systems have become more and more sophisticated. See 2A Sands, Sutherland Statutory Construction § 49.05, at 239 (4th ed. 1973). The board "may decline to exercise its full potential jurisdiction." *Brooks* v. *Architectural Barriers Bd.,* 14 Mass. App. Ct. 584, 589 (1982). The broad grant of power conferred upon the board by reason of c. 141, §§ 1 and 2, permits it to consider changing conditions and "necessarily implies a range of authority for establishing priorities for enforcement of the general legislative policy." 14 Mass. App. Ct. at 588.

We are also influenced by the fact that another agency, the Board of Fire Prevention Regulations, has interpreted language identical to c. 141, § 1, to permit regulation of burglar and fire alarms by that agency. General Laws c. 143, § 3L, as amended through St. 1977, c. 64, § 1, provides that the board shall "make . . . regulations relative to the installation, repair and maintenance of electrical wiring and electrical fixtures used for light, heat and power purposes." The Board of Fire Prevention Regulations has regulated "outside wiring for fire alarm and burglar alarms," 527 Code Mass. Regs. 12.00, art. 800-1 (1981) since 1951, just one year after its enabling statute

---

[7] Because, as previously noted, we view § 1 as a "legislative policy which is only broadly set out," *School Comm. of Springfield* v. *Board of Educ.,* 362 Mass. at 442, thereby requiring that the board's interpretation be given deference and great weight, it is not enough for the plaintiffs to show that § 1 might arguably lend itself to the construction which they urge. See *Consolidated Cigar Corp.* v. *Department of Pub. Health,* 372 Mass. at 855.

was enacted. See St. 1950, c. 617. Thus, there is a consistent, long-standing administrative interpretation of the phrase in question by another agency dealing with the same or almost the same subject matter. See *Cleary* v. *Cardullo's, Inc.*, 347 Mass. 337, 343 (1964); *School Comm. of Springfield* v. *Board of Educ.*, 362 Mass. 417, 441 n.22 (1972); *Devlin* v. *Commissioner of Correction,* 364 Mass. 435, 439 (1973). We note that there is no justification in the statutory language for the distinction made by the dissent between high and low voltage wiring. We also note that were we to adopt the plaintiffs' construction of the phrase "light, heat or power purposes," i.e., distinct, limited end products of electricity, we would render meaningless the exemption set out in G. L. c. 141, § 7, for telephone and telegraph companies. (See part IV of this opinion, *infra.*)

In view of all these considerations, we reject the plaintiffs' contentions as to the construction of the statute.

III.  THE REGULATION.

In their brief the plaintiffs correctly concede that "the purpose of the enabling legislation was to protect the health and safety of the public." Thus, by well established law, "we must apply all rational presumptions in favor of the validity of the administrative action and not declare it void unless its provisions cannot by any reasonable construction be interpreted in harmony with the legislative mandate." *Consolidated Cigar Corp.* v. *Department of Pub. Health,* 372 Mass. at 855. Quite simply, the question is whether the regulation is "reasonably related to the purposes of the enabling legislation." *Mourning* v. *Family Pub. Serv., Inc.,* 411 U.S. 356, 369 (1973). See *Consolidated Cigar Corp.* v. *Department of Pub. Health,* 372 Mass. at 855; *Levy* v. *Board of Registration & Discipline in Medicine,* 378 Mass. 519, 524 (1979); *Coonamesset Inn* v. *Chief of the Falmouth Fire Dept.,* 16 Mass. App. Ct. 632, 635 (1983).

As in *Coonamesset,* at 636, it is here also "readily apparent that [c. 141, § 1] does not address comprehensively all of the matters that may come within its scope." However, there was testimony on a point we think obvious: that the improper installation of wire conduits could cause fire and electrical shock. We

need go no further to conclude that the regulation is reasonably related to the enabling statute.

By their complaint the plaintiffs sought and obtained a determination that the regulation "is invalid in its application to each of" them. "In a challenge under G. L. c. 30A, § 7, to a regulation, the plaintiff must prove its case in the judicial proceeding [citations omitted]." *Grocery Manufacturers of America, Inc.* v. *Department of Pub. Health,* 379 Mass. 70, 81 (1979). The parties' stipulation does not satisfy the heavy burden that the plaintiffs must meet to entitle them to a declaration that the regulation is invalid in its application to them.

Both at trial and on appeal, the thrust of the plaintiffs' argument has been that the regulation is inapplicable to them because their systems produce signals rather than light, heat, or power.[8] They have not prevailed with that argument in this court. That the regulation might be applied to alarm systems not reasonably within the comprehension of c. 141, § 1, is a question which must await a more focused attack and better record. All that has been shown here is that collectively the plaintiffs install all the previously described alarm systems. We will not ignore the plaintiffs' burden of proof or the need for the board's expertise concerning any given system in order to declare which system installed might not "require the use of wires for transmission," as that regulation is construed in harmony with c. 141, § 1. We determine only that the regulation is not invalid on its face and that the plaintiffs are not entitled to a declaration of the invalidity of the regulation as applied to them. Our holding does not preclude any further litigation by these plaintiffs on the issue of the applicability of the regulation to any particular system claimed to be outside the scope of the statute and regulation.

---

[8] From our examination of the record, which includes the transcript of trial and lobby conferences, we think that the judgment entered by the trial judge rests upon his agreement with the plaintiffs' argument in general and not upon any particular determinations as to the methods of installation and operation of the various individual alarm systems.

IV. THE EXEMPTION.

The plaintiffs also claim (and the trial judge agreed and concluded) that even if § 1 and the regulation were applicable to them, they are exempt therefrom by reason of § 7.

General Laws c. 141, § 7, provides in pertinent part: "[Chapter 141] shall not apply . . . to the work of companies incorporated for the transmission of intelligence by electricity in installing, maintaining, or repairing wires, apparatus, fixtures or other appliances used by such companies and necessary for or incident to their business, whether or not such wires, conduits, apparatus, fixtures or other appliances are on its own premises." Section 7 has remained unchanged since its adoption by St. 1915, c. 296, § 7.

The plaintiffs claim the benefits of § 7 on the basis that "[t]he fundamental purpose of all [alarm] systems is to transmit or communicate, by means of the wires and other devices installed, the fact that an intruder is on the premises or that there is a fire, or smoke, on the premises . . . . [T]he purpose is to convey specific intelligence to persons in the vicinity or who are specifically monitoring the system." The plaintiffs read the exemption as applying to all information transmitted by electricity.

The board, on the other hand, argues that the words "transmission of intelligence by electricity" refer to the telephone and telegraph (see *Commonwealth v. Boston,* 97 Mass. 555, 559 [1867]; *Pierce v. Drew,* 136 Mass. 75, 76 [1883]; *New England Tel. & Tel. Co. v. Boston Terminal Co.,* 182 Mass. 397, 398 [1903]) and that the exemption applies only to telephone and telegraph companies.

In construing the statutory exemption contained in § 7, we note that the telephone and telegraph have been described as modes of transmitting intelligence. See *Pierce v. Drew,* 136 Mass. at 81; *Mentzer v. New England Tel. & Tel. Co.,* 276 Mass. 478, 483 (1931). While the phrase "transmission of intelligence" has come to embrace other modes of communicating information, the term still is generally used within the telecommunications industry. See, e.g., *First Data Corp. v. State Tax Commn.,* 371 Mass. 444, 445, 448 (1976); *Westinghouse*

*Bdcst. Co.* v. *Commissioner of Rev.,* 382 Mass. 354, 357-358 (1981). See also e.g., *KAOK-CATV, Inc.* v. *Louisiana Cable T.V., Inc.,* 195 So.2d 297, 300 (La. App. 1967); *Waterville* v. *Bartell Tel. TV Syss.,* 233 A.2d 711, 717 (Me. 1967); *White* v. *Ann Arbor,* 406 Mich. 554 (1979). Cf. *Owl Protective Co.* v. *Feinberg,* 3 App. Div. 2d 340, 344-345 (N.Y. 1957), where the Supreme Court stated that "[b]ecause a burglar may involuntarily telegraph his unlawful entrance over a leased wire, it does not follow that either the owner of the protected establishment, or the burglar alarm company, is engaged in the telegraph business."

Even assuming that c. 141 is penal in nature by reason of § 5, see *Maria* v. *State Examiners of Electricians,* 365 Mass. at 554, and that the exemption § 7 must, therefore, be broadly construed, cf. *Wood* v. *Commissioner of Correction,* 363 Mass. 79, 81 (1973), we cannot interpret § 7 so that it is "stretched by enlargement of signification to comprehend matters not within the principle and purview on which they were founded when originally framed and their words chosen." *Commonwealth* v. *Welosky,* 276 Mass. at 401-402. We conclude that the exemption applies to the transmission of intelligence by telephone, telegraph, and similar or analogous instrumentalities. The plaintiffs' burglar, fire, and smoke alarm systems may well transmit informative signals, noise, light, or any combination thereof, but they do not convey that type of intelligence comprehended by the exemption set out in § 7.

V.  CONCLUSION.

The judgment in its present form is vacated, and the matter is remanded to the Superior Court for the entry of a new judgment declaring that the regulation is valid and that the plaintiffs are not exempt from the operation of G. L. c. 141, § 1, by reason of c. 141, § 7.

*So ordered.*


ROSE, J. (dissenting). I respectfully dissent from the majority opinion. The board has promulgated a regulation excessively

broad in scope, purporting to require an electrician's license for "fire alarm and all signal work requiring the use of wire for transmission," and has exceeded its authority in doing so. The installation of fire and burglar alarm systems, insofar as it involves installation of wires or other apparatus used only for the purpose of transmitting low voltage, limited current electrical signals, does not fall within the definition of wiring and equipment for "carrying or using electricity for light, heat and power purposes," as that phrase appears in G. L. c. 141, § 1. Such work is thus beyond the scope of the board's regulatory authority.

Since G. L. c. 141, § 1, is not permissive but mandatory, the majority opinion, interpreting that section to authorize the challenged regulation, appears to have the effect of requiring a licensed electrician to install any appliance, equipment, or wiring, which simply plugs into a standard household outlet. Even the installation of wires connecting intercom, paging, or public address systems would seem to require a licensed electrician, under the reasoning of the majority.[1] The Legislature could not have intended a result so contrary to common sense in adopting G. L. c. 141, §§ 1-2. Moreover, quite aside from driving some of the plaintiffs out of business, the result which the majority reaches will impose a significant cost without corresponding benefit upon the public.

The use of electricity for the purpose or intended result of transmitting a limited current electrical signal is a use separate and distinct from the use of electricity for the purpose or intended result of producing heat, light, or power. Other statutory provisions in the Commonwealth recognize the distinct nature of those uses.[2] The board's contrary contention that the

---

[1] According to the testimony of the board's only witness, burglar and fire alarm systems, doctors' register systems, nurses' call systems, paging systems, intercom systems, and telephones all fall into the same category of electrical work.

[2] See G. L. c. 166, § 21, as appearing in St. 1951, c. 476, § 1 (regulating companies "incorporated for the transmission of intelligence by electricity or by telephone, whether by electricity or otherwise, or for the transmission of television signals, whether by electricity or otherwise, or for the transmis-

Simon *v.* State Examiners of Electricians.

transmission of signals over wire constitutes the "use of electricity for heat, light and power purposes" is belied by the board's own regulation: the board has deemed it necessary to *add* the words "fire alarm and all signal work requiring the use of wire for transmission" to the statutory language in order to bring the plaintiffs' work within the ambit of the regulation. Plainly, the board did not consider the statutory language alone sufficient to establish the requirement of an electrician's license for "fire alarm and all signal work."

In promulgating a regulation with such broad and inseverable language, the board has swept in matters both inside and outside of its scope of authority. I would not dispute the board's authority to regulate certain aspects of the plaintiffs' work (e.g., hard wiring [direct connection] with a power source). Indeed, the plaintiffs themselves do not appear to contest the board's authority to require an electrician's license for hard wiring since, by their own stipulation, the plaintiffs always have a licensed electrician do any necessary hard wiring. However, the board does not have authority under G. L. c. 141, §§ 1 and 2, to require an electrician's license for the installation of low voltage, limited current signaling systems, not unlike telephone

---

sion of electricity for lighting, heating or power, or for the construction and operation of a street railway or an electric railroad . . ."); G. L. c. 166, § 22A, as appearing in St. 1969, c. 884, § 1 (defining regulated "poles and overhead wires" to include those "used or useful in the transmission of intelligence by electricity or otherwise, or for the transmission of television signals, whether by electricity or otherwise, or for the transmission of electricity for lighting, heating or power, or for the construction or operation of a street railway or an electric railroad . . ."). See also 527 Code Mass. Regs. § 12.00, art. 725-1 (1981) (a regulation promulgated by the Board of Fire Prevention Regulations, stating that certain "signaling[ ] and power limited circuits . . . are characterized by usage and electrical power limitations which differentiate them from light and power circuits . . ."). Statutory provisions enacted by the Legislatures of other States have also recognized the distinct nature of those uses. See N.Y. Gen. City Law § 20 (McKinney 1968) (defining "master electrician" as person or entity who or which installs, alters or repairs "any electric wires or wiring apparatus, fixtures and other appliances used or to be used for the transmission of electricity for light, heat or power, or signaling system where more than fifty volts is required for its operation").

or intercom systems,[3] which connect with a power source by means of a plug placed in a preexisting household outlet. Thus the portion of the regulation at issue purporting to regulate such installations is on its face beyond the scope of the board's authority and was properly declared invalid by the Superior Court judge.

I cannot agree with the conclusion of the majority that the challenged regulation, despite its sweeping scope, is valid because "reasonably related" to the purpose of the enabling legislation, protecting public health and safety. More is required to justify raising the concern of public health and safety than the danger of a 12-volt shock[4] or the danger posed by the insertion of a plug in an electrical socket. I see no evidence that, by adopting c. 141, the Legislature intended to invest the board with authority to regulate all electrical work which could present any risk to public health and safety, no matter how inconsequential the risk and no matter how remote the likelihood of realizing that risk. In fact there is evidence to the contrary. The Legislature has twice declined to adopt proposed amendments to c. 141 expanding the board's jurisdiction. See note 5, *infra*.

I am not persuaded by the majority's discussion of the legislative history of enactments other than the one before us. Cf. *Commonwealth* v. *Brown,* 391 Mass. 157, 162 (1984) (wherein the court stated, "We do not agree that the intent of the Legislature in 1915, in enacting G. L. c. 43, § 28 [governing bidding on public contracts], is revealed by statutes enacted many years later when the range of legislative concern may well have expanded to include . . . [matters] that were not the concern of the earlier Legislature"). That discussion does not explain why signaling, certainly a use of electricity well known in 1915 and probably the first common use of electricity, was omitted from the phrase describing the type of wiring and

---

[3] The board's only witness testified that burglar and fire alarm systems are similar to telephone systems, both using low voltage electricity.

[4] Such a shock would be at most "slight" even according to the testimony of the board's only witness.

equipment for which the board was authorized to issue licenses under G. L. c. 141, §§ 1 and 2. Heat, light, and power may indeed be "but varied manifestations of the same thing": different employments of identical electrical current, presenting identical risks. However, low voltage, limited current signaling is not.

Nor am I persuaded that the interpretation which a different agency, the Board of Fire Prevention Regulations, has attached to similar language appearing in a different statute, G. L. c. 143, § 3L, supports the majority's construction of G. L. c. 141, § 1. In the first place, the Board of Fire Prevention Regulations has not promulgated regulations so broad in scope as the one presently before the court. Its regulations apply to ". . . *outside wiring* for fire alarm and burglar alarms and similar central station systems . . ." (emphasis added). 527 Code Mass. Regs. § 12.00, art. 800-1 (1981). However the words "outside wiring" might be defined, they are plainly less inclusive than the words "fire alarm and *all signal work requiring the use of wire for transmission*" appearing in the regulation at issue. None of the regulations included in 527 Code Mass. Regs. § 12.00, art. 800 (1981), would apply to the typical burglar alarm system described in the parties' stipulation. Secondly, to the extent regulations promulgated by the Board of Fire Prevention Regulations purport to regulate the installation of wiring and equipment used only for the purpose of transmitting low voltage signals, those regulations do not appear to be authorized by G. L. c. 143, § 3L.[5]

---

[5] This construction of G. L. c. 143, § 3L, would not necessarily cast doubt upon the authority of the Board of Fire Prevention Regulations (established under G. L. c. 22, § 14) to promulgate rules relating to the fire safety of electrical wiring and equipment applicable to the work done by the plaintiffs. See 527 Code Mass. Regs. § 12.00, art. 800 (1981). The Board of Fire Prevention Regulations is charged with the duty of promulgating a "comprehensive fire safety code." G. L. c. 22, § 14, as appearing in St. 1980, c. 462, § 1. G. L. c. 148, § 28, as appearing in St. 1982, c. 520. In carrying out that duty, that board is required to promulgate regulations to, among other things, "prevent or remedy any condition in or about any building, structure or other premises . . . which may tend to become a fire hazard or to cause a fire." G. L. c. 148, § 28. Thus the Legislature has vested the Board of Fire Prevention Regulations with broad authority to

Moreover, it is clear that much of the plaintiffs' work could not pose any significant threat to public health or safety. The parties' stipulation provides that "[a]ll modern burglar alarm systems and approximately fifty percent of all fire alarm systems are connected to a power supply by means of a plug-in transformer." Thus, the bulk of the systems installed by the plaintiffs simply plug into an existing standard household outlet and, due to the transformer, are powered by a low voltage, limited current of electricity. The danger posed is no greater than that posed by a telephone, and probably less than that posed by any ordinary household appliance which plugs into a household outlet. Cf. 527 Code Mass. Regs. § 12.00, art. 725-40 (for certain "low energy" circuits, "conductor insulation is not specified in . . . detail as reliance is placed on . . . power supplies which limit voltage and current to safe values"). As the trial judge noted, "[T]he use of very little current does make a difference." In stating that "there was testimony on a point we think obvious: that the improper installation of wire conduits could cause fire and electrical shock," the majority fails to distinguish between very different types of wiring: ordinary wiring, carrying a full current of electricity, connecting directly to a power source, as opposed to low voltage wiring carrying a low voltage, limited current of electricity connecting to a power source by means of a transformer plugged into a preexisting standard household outlet. The majority also relies on the heavily contradicted testimony of a single witness,

determine the appropriate focus or subject matter of those regulations. Compare earlier versions of G. L. c. 148, § 28 (St. 1945, c. 710; St. 1980, c. 462, § 2), which allowed the board substantially less discretion. (It is noteworthy that the discretion of the of State Examiners of Electricians has not been similarly expanded.) Therefore, notwithstanding the presence of the phrase here at issue in G. L. c. 143, § 3L (expressly requiring the Board of Fire Prevention Regulations to promulgate rules relating to the fire safety of electrical wiring and equipment used for "light, heat, and power purposes"), the court would not be constrained to conclude that regulations applicable to the plaintiffs in the instant case promulgated by the Board of Fire Prevention Regulations are beyond that board's scope of authority. See *Grocery Manufacturers of America, Inc.* v. *Department of Pub. Health,* 379 Mass. 70, 76 (1979) ("[s]pecific statutory authority to act in a particular respect does not bar consistent action under general statutory authority").

who admitted having no recent experience in alarm installa-
tions, regarding a matter on which the trial judge made no
findings of fact.[6]

In reaching the conclusion that the portion of the regulation
in question is beyond the scope of the board's statutory author-
ity, I am not unmindful of the presumption of validity to which
the regulation is entitled, see, e.g., *Consolidated Cigar Corp.*
v. *Department of Pub. Health,* 372 Mass. 844, 855 (1977);
*White Dove, Inc.* v. *Director of the Div. of Marine Fisheries,*
380 Mass. 471, 477 (1980), and the degree of deference to
which the board's interpretation of the statute it is charged
with enforcing is entitled, see, e.g., *Grocery Manufacturers
of America, Inc.* v. *Department of Public Health,* 379 Mass.
70, 75, 85 (1979).[7] However, these principles are principles of

---

[6] It should also be noted that history indicates that the majority's public
safety concern is without foundation. The parties' stipulation of agreed facts
contains the statements that "no claims have ever been filed against any of
the Plaintiffs claiming any personal injuries or death or property damage
as a result of their assembly or installation of burglar and/or fire and/or
smoke alarm equipment in Massachusetts," and that "the Defendant Board
has no records of complaints of personal injury or death or property damage
attributable to faulty or defective assembly or installation of burglar and/or
fire and/or smoke alarm equipment in Massachusetts." The plaintiffs have
all been in the alarm installation business for substantial periods of time,
ranging from twenty-three to one hundred six years.

[7] The degree of deference to which an agency's interpretation of a statute
is entitled is itself a question of legislative intent. *Ciampa* v. *Secretary of
Health and Human Services,* 687 F.2d 518, 526 (1st Cir. 1982). See *Mas-
sachusetts Organization of State Engineers & Scientists* v. *Labor Relations
Commn.,* 389 Mass. 920, 924 (1983). Where the Legislature has granted
broad agency authority to deal with an entire area of activity, the agency's
interpretation of its statute is "especially significant" and entitled to great
weight. *Massachusetts Organization of State Engineers & Scientists* v.
*Labor Relations Commn., supra.* "Where no such broad statutory grant
exists, closer scrutiny of the authority of the agency is required and has
been applied." *Grocery Manufacturers of America, Inc.* v. *Department of
Pub. Health,* 379 Mass. 70, 75 (1979), and cases therein cited. I do not
consider the board to be possessed of a broad statutory grant; thus I would
give closer scrutiny to the board's construction of the statute determining
the scope of its authority. Cf. *Grocery Manufacturers of America, Inc.* v.
*Department of Pub. Health, supra* at 75-77; *Morello* v. *Boston Rent Control
Bd.,* 14 Mass. App. Ct. 27, 32-33 (1982); *Massachusetts Retired Police &
Firefighters Assn.* v. *Retirement Bd. of Belmont,* 15 Mass. App. Ct. 212, 217

deference, not abdication. See *Nickerson* v. *Ribicoff*, 206 F. Supp. 232, 234 (1962). Cf. *Finkelstein* v. *Board of Registration in Optometry*, 370 Mass. 476, 478 (1976); *Board of Educ.* v. *School Committee of Amesbury*, 16 Mass. App. Ct. 508, 514 (1983). "The construction of the statute is a matter of law and . . . the courts cannot be bound by an erroneous statutory construction by an administrative body." *McDonough* v. *Contributory Retirement Appeal Board*, 15 Mass. App. Ct. 14, 15 (1982), citing *Russo* v. *Director of the Div. of Employment Security*, 377 Mass. 645, 649 (1979); *Johnson* v. *Martignetti*, 374 Mass. 787, 790 (1978). See *Treasurer and Receiver General* v. *John Hancock Mut. Life Ins. Co.*, 388 Mass. 410, 423 n.25 (1983). Judicial deference to an agency's attempt to extend its authority beyond statutory confines is especially inappropriate when, as here, such an extension would be tantamount to granting a legal monopoly to the trade group which the agency not only regulates but from which its members are

---

n.7 (1983). Compare *Warner Cable of Mass., Inc.* v. *Community Antenna Television Commn.*, 372 Mass. 495 (1977); *Rock* v. *Massachusetts Commn. Against Discrimination*, 384 Mass. 198, 206-208 (1981). I would further note that this is not a case involving either consistent or contemporaneous agency interpretation of a statute which would entitle the agency interpretation to greater weight. See *Cleary* v. *Cardullo's, Inc.*, 347 Mass. 337, 343 (1964); *Casa Loma, Inc.* v. *Alcoholic Beverages Control Commn.*, 377 Mass. 231, 235 (1979). Moreover, although administrative power granted by the Legislature cannot lapse through an agency's failure to exercise it, the hiatus of nearly sixty years between the board's assumption of its duties and its first assertion of jurisdiction over the plaintiffs is suggestive of a lack of authority. "[J]ust as established practice may shed light on the extent of power conveyed by general statutory language, so the want of assertion of power by those who presumably would be alert to exercise it, is equally significant in determining whether such power was actually conferred." *Federal Trade Commn.* v. *Bunte Bros.*, 312 U.S. 349, 352 (1941). See 2A Sands, Sutherland Statutory Construction, § 49.05, at 239 (4th ed. 1973). In this regard, it is noteworthy that, according to the board's only witness, the average alarm system has become far *less* dangerous in the last ten or twenty years due to the advent of 12-volt and 24-volt systems. Thus, the board cannot argue that its recent assertion of authority over alarm installations is in response to increased danger in alarm systems. Counsel for the board at trial conceded that "the technology, and indeed some of the plaintiff organizations, predate the 1915 date of the statute."

drawn.[8] See Gellhorn, Abuse of Occupational Licensing, 44 U. Chi. L. Rev. 6 (1976).

In my view, the court should not defer to the board's broad construction of the phrase "heat, light and power purposes," as it appears in G. L. c. 141, § 1, to include all uses of electricity, because that construction renders the phrase superfluous. Cf. *Morello* v. *Boston Rent Control Bd.*, 14 Mass. App. Ct. 27, 32 n.4 (1982). "None of the words of a statute is to be disregarded, for they are the main source for the ascertainment of the legislative purpose." *Treasurer and Receiver General* v. *John Hancock Mut. Life Ins. Co.*, 388 Mass. at 422. *United States Jaycees* v. *Mass. Commn. Against Discrimination*, 391 Mass. 594, 602 (1984). See *Commonwealth* v. *Brown*, 391 Mass. at 162. The board's construction of the phrase in question has the effect of removing the phrase from the statute; with the phrase removed, the statute would require the licensing of persons, firms and corporations which "enter into, engage in, or work at the business of installing wires, conduits, apparatus, fixtures or other appliances for carrying or using electricity." This truncated version of the statute is not the version which the Legislature enacted. Compare G. L. c. 164, § 1(7), as amended through St. 1982, c. 120, § 3 (regulation of corporations "selling, or distributing and selling, electricity within the Commonwealth . . ."). The task of amending a statute is solely the responsibility of the Legislature.[9] *Mellor* v. *Berman*, 390 Mass. 275, 283 (1983).

---

[8] Indeed, the Electrical Contractors Association of Greater Boston had an interest in the board's expansion of authority significant enough to prompt it to file an amicus brief in this case. See n.4 to the majority opinion.

[9] It should be noted that on at least two occasions, the Legislature has declined to amend the statute specifically to include within the board's jurisdiction the installation of wires and equipment using electricity for purposes other than heat, light, or power. See 1975 House Doc. No. 145 (allowing board to regulate installation of wires and equipment "for carrying or using electricity for light, heat or power purposes, *or any other purposes* . . ." [emphasis added]); 1973 House Doc. No. 4143 (allowing board to regulate installation of wires and equipment "for carrying or using electricity for light, heat, power, *burglar alarm, fire alarm, sprinkler alarm, x-ray equipment, communication systems and signal systems* . . ."). Although the

In my view, the words "heat, light and power" must be read as words of qualification or limitation, from which the court must necessarily infer the existence and exclusion from c. 141 of other purposes for which electricity might be used. Such a reading is consistent with the principle that, as a penal statute, G. L. c. 141, § 1, must be construed strictly in determining the scope of its application, see *Maria* v. *State Examrs. of Electricians,* 365 Mass. 551, 554 (1974); *Commonwealth* v. *Brown, supra* at 159, and the principle that "a statutory expression of one thing is an implied exclusion of other things omitted from the statute." *County of Middlesex* v. *Newton,* 13 Mass. App. Ct. 538, 542-543 (1982), and authorities therein cited. See *Cawley* v. *Northern Waste Co.,* 239 Mass. 540, 542-544 (1921) (implicitly approving portion of city ordinance promulgated in discharge of city's duty under St. 1890, c. 404, § 3 [see now G. L. c. 166, § 32], to provide for appointment or designation of an officer to "supervise . . . every wire within a building when such wire is designed to carry an electric light or power current," providing that ordinance did not call for inspection of electric bell system); Rep. A.G. Pub. Doc. No. 12, at 22-23 (1948) (wires and apparatus for transmission of television signals are not installed or used for carrying or using "electricity for light, heat and power purposes" within the meaning of G. L. c. 141, § 7; nor do they carry "an electric light, heat or power current" within the meaning of G. L. c. 166, §§ 30-32). Cf. G. L. c. 166, § 30 (prescribing, among other things, insulation requirements for outdoor transmission wires, where wire is "designed to carry an electric light, heat or power current" *and* where "wire is other than a wire designed to carry an electric light, heat or power current").

There is no rational way to sever any portion of the regulation's language or otherwise whittle it down to preserve the

failure of those two bills to pass might be interpreted as a legislative judgment that such amendments were unnecessary because the statute already conferred the broader jurisdiction on the board, it is far more likely that the failure represents a legislative decision not to *expand* the board's jurisdiction. See 2A Sands, Sutherland Statutory Construction § 48.18, at 224 (4th ed. 1973), citing *Rea* v. *Aldermen of Everett,* 217 Mass. 427 (1914). The 1975 bill was sponsored by the board.

board's assertion of authority with respect to *some* aspects of alarm installation. Therefore, the question whether the board has the authority to regulate other nonsignaling or higher voltage aspects of the installation of alarm systems which could pose a threat to public safety, such as "hard wiring" or the automatic control of ventilation systems, is not presently before the court. Since the portion of the regulation at issue is on its face beyond the scope of the board's authority under § 1, there is no issue with respect to the adequacy of the plaintiffs' development of the record below which could preclude entry of judgment declaring that portion of the regulation invalid. See G. L. c. 231A, § 2; G. L. c. 30A, § 7. I would affirm the judgment of the Superior Court.

Because I would uphold the judgment of the Superior Court declaring the portion of the regulation at issue invalid as beyond the board's authority under G. L. c. 141, § 1, I would not reach the question whether the plaintiffs' work falls within the exemption for the transmission of intelligence by electricity contained within G. L. c. 141, § 7. Were I to reach that question, I would not necessarily reach the result which the majority reaches.