MURRY G. SIMON & others[1] *vs.* STATE EXAMINERS OF
ELECTRICIANS.

Suffolk. December 5, 1984. — June 25, 1985.

Present: HENNESSEY, C.J., WILKINS, LIACOS, ABRAMS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Alarm Systems. Electricians. Administrative Law,* Regulations, Agency,
Agency's interpretation of statute. *Statute,* Construction.

The State Examiners of Electricians lacked power under G. L. c. 141, § 1,
to adopt a regulation requiring that all electrical work on fire and burglar
alarm systems be performed by licensed electricians. [242-249] O'CON-
NOR, J. (dissenting with whom HENNESSEY, C.J., joins).

CIVIL ACTION commenced in the Superior Court on March
10, 1975.

The case was heard by *Ernest S. Hayeck,* J., sitting under
statutory authority.

After review by the Appeals Court, the Supreme Judicial
Court granted leave to obtain further appellate review.

*Anne L. Berger* for the plaintiffs.

*Stephen S. Ostrach,* Assistant Attorney General, for the
defendant.

*Peter J. Gagne,* for Electrical Contractors Association of
Greater Boston, amicus curiae, submitted a brief.

*Paul F. Kelly,* for Excavating and Building Material Chauf-
feurs and Helpers Local Union No. 379, amicus curiae, submit-
ted a brief.

LYNCH, J. The plaintiffs challenge a rule promulgated by
the State Examiners of Electricians (examiners), which effec-

---

[1] American District Telegraph Company, Andrew J. Crotty, Jr., Fred
Tapper, Massachusetts Alarm Association, Inc., and Massachusetts Security
Contractors Association.

We acknowledge the briefs of amici curiae Excavating and Building
Material Chauffeurs and Helpers Local Union No. 379 and Electrical Con-
tractors Association of Greater Boston.

tively requires that only licensed electricians install fire or burglar alarm systems in the Commonwealth.[2] The plaintiffs prevailed in the Superior Court, which held the rule to be invalid, but a divided panel of the Appeals Court reversed. See *Simon v. State Examiners of Electricians,* 18 Mass. App. Ct. 17 (1984). We granted the plaintiffs' application for further appellate review, and we now disagree with the conclusion of the Appeals Court and affirm the judgment for the plaintiffs entered in the Superior Court.

The central question in this dispute is the extent of authority the Legislature intended to grant to the examiners by using the words "for light, heat or power purposes" after "electricity" in G. L. c. 141, § 1.[3] The examiners contend that these words were not meant to limit their authority, but instead to emphasize its comprehensiveness. A majority of the Appeals Court panel agreed, holding that these words are "just different ways of phrasing the common uses of electricity." *Simon v. State Examiners of Electricians, supra* at 24. The plaintiffs argue that the words were meant as a limitation on the examiners' authority, and that their interpretation is supported by the his-

---

[2] Rule 2.2, now codified at 237 Code Mass. Regs. § 4.02 (3) (1981), states: "All persons, firms and corporations entering into, engaging in or working at the business of installing wires, conduits, apparatus, fixtures or other appliances for carrying or using electricity for light, heat, or power purposes, *fire alarm and all signal work requiring the use of wire for transmission,* within the Commonwealth of Massachusetts shall be governed by the applicable provisions, now or hereafter in force, of all general and special laws; all rules and regulations made and promulgated pursuant to the provisions of any such law; and in respect to all matters not therein expressly provided shall be governed by the standards set forth in the 1981 Massachusetts Electrical Code, 527 CMR: 12.00 and as may be from time to time amended, for Electrical Wiring and Apparatus as Rules and Requirements for Electrical Wiring in Massachusetts adopted by this Board on June 22, 1981." (Emphasis added.)

[3] In relevant part, G. L. c. 141, § 1, inserted by St. 1915, c. 296, § 1, provides: "No person, firm or corporation shall enter into, engage in, or work at the business of installing wires, conduits, apparatus, fixtures or other appliances for carrying or using electricity for light, heat or power purposes, unless such person, firm or corporation shall have received a license and a certificate therefor, issued by the state examiners of electricians and in accordance with the provisions hereinafter set forth."

tory surrounding the statute and the policies it was designed to further. Alternatively, the plaintiffs contend that they are engaged in the transmission of intelligence by electricity, within the meaning of the exemption created by G. L. c. 141, § 7.[4] The Appeals Court also rejected this argument. *Id.* at 27-28. We decide that rule 2.2 exceeds the power granted to the examiners by G. L. c. 141, § 1.[5]

The facts underlying this case are stipulated. The plaintiffs are engaged in the business of installing and maintaining fire and burglar alarm systems in commercial and residential properties in the Commonwealth. Most of the contracts entered into by the plaintiffs include long-term agreements for maintenance, and virtually all of the contracts with commercial customers include monitoring the customers' premises by a central station which notifies police or fire officials should a break-in or fire occur.

Essentially, a typical fire alarm system consists of a control box, connected by wire or plug-in transformer to a source of electricity which provides the power to operate the system. This control box is also connected by other wires to the component parts of the system, such as horns, sprinklers, thermostats, smoke detectors, and alarm boxes. The typical burglar alarm system is similar, except that the component parts include such devices as bells, sirens, space detectors, and perimeter detectors. In all modern burglar alarm systems, and about fifty per cent of all fire alarm systems, the control box is connected to a power supply by means of a plug-in transformer, which "steps down" the voltage from normal household current to a lower voltage, similar to that used in telephone wires. The installation of this transformer is performed by a licensed elec-

---

[4] General Laws c. 141, § 7, exempts from its coverage "the work of companies incorporated for the transmission of intelligence by electricity in installing, maintaining or repairing wires, apparatus, fixtures or other appliances used by such companies and necessary for or incident to their business."

[5] We need not decide whether the plaintiffs are engaged in the transmission of intelligence by electricity within the meaning of G. L. c. 141, § 7, and we therefore intimate no view on this question.

trician. Similarly, all "hard-wiring," that is, the direct connection of the control box to the live electric wires supplying power, is done by licensed electricians in situations where a plug-in transformer is not used. However, installation of the components of the alarm system is performed by technicians who are not licensed electricians. The wires that these technicians install do not carry electricity until the control box has been connected to a source of power.

A majority of the individuals and corporations engaged in the business of installing alarm systems do not have electricians' licenses. Under rule 2.2, they would be required to obtain licenses or to hire licensed electricians in order to continue in business. The plaintiffs' customers prefer that the plaintiffs' technicians, rather than licensed electricians, install the component parts and wires of the alarm systems. This is the case not only because installation and maintenance is less expensive that way, but also because the technicians are bonded and heavily insured, due to the confidential information they learn during the course of their work and the consequences of a system failure. The examiners do not require that licensed electricians be either bonded or insured. No claims have ever been filed against any of the plaintiffs for damage or personal injury as the result of the installation of an alarm system in Massachusetts, and the examiners have received no complaints about them.

In 1969, the examiners amended rule 2.2 to read in its present form, although enforcement was not attempted until 1974. On March 20, 1975, the plaintiffs' motion for a preliminary injunction was granted, and on September 11, 1980, rule 2.2 was declared invalid by a judge in the Superior Court. He found that the plaintiffs "are not engaged in or working at the business of installing wires, conduits, apparatus, fixtures or other appliances for carrying or using electricity for light, heat, or power purposes." The judge also found that the plaintiffs were engaged in the transmission of intelligence by electricity, within the meaning of the exemption contained in G. L. c. 141, § 7. A divided Appeals Court reversed on both grounds. We now decide that rule 2.2 exceeds the powers the Legislature granted to the examiners, and is therefore invalid.

1. *The statute.* The starting point of our analysis is the language of the statute, "the principal source of insight into Legislative purpose." *Commonwealth* v. *Lightfoot,* 391 Mass. 718, 720 (1984). In this case, we must determine whether, by using the phrase "for light, heat or power purposes," the Legislature intended to emphasize the broad reach of the statute or to narrow its scope. We decide that the phrase was intended to be one of limitation.

The words "light, heat or power" are not unique to G. L. c. 141, § 1, and that statute cannot be interpreted properly without an analysis of the context in which the phrase arose. The Legislature originally chose this terminology to describe companies organized for the purpose of generating or selling electricity. In its first definition of an "electric light company," the Legislature used the words "any corporation organized . . . for the purpose of making or selling electricity only for light, heat or power." St. 1908, c. 529, § 1.[6] Thus, the term had acquired a specialized legislative meaning, relating to the sale of electric power by utilities, by the time St. 1915, c. 296, § 1 (now G. L. c. 141, § 1), was enacted. This court has also used that phrase in the same, specialized sense. See *Tax Collector of N. Reading* v. *Reading,* 366 Mass. 438, 441 (1974) ("development of electricity for light, heat, and power by a municipality"); *Commissioner of Corps. & Taxation* v. *Springfield,* 321 Mass. 31, 37-39 (1947); *Barnes* v. *Peck,* 283 Mass. 618, 629 (1933); *Opinion of the Justices,* 150 Mass. 592, 598 (1890).

---

[6] This definition was the product of a long line of statutes concerning electricity that used various combinations of the words "light," "heat" and "power" in the same utility context. In St. 1883, c. 221, the Legislature began regulating directly the use of electricity by subjecting its transmission "for the purpose of lighting" to all provisions previously enacted which regulated telegraph lines. In St. 1887, c. 382, § 1, the board of gas commissioners was given general supervision over companies organized for the "manufacture and sale of electric light." At the same time, gas companies were authorized to furnish "electricity for light and power." St. 1887, c. 385, § 1. Later, companies authorized to provide electricity for "light and power" were permitted to sell electricity "for operating heating, cooking and kindred apparatus, and motors." St. 1895, c. 420, § 1. The first reference to these companies using the phrase "electricity for light, heat or power" appears in Revised Laws c. 34, § 1 (1902).

Thus, we should consider the utility context from which the phrase arose when interpreting the words of the statute. As Chief Justice Rugg observed: "Statutes are to be interpreted, not alone according to their simple, literal or strict verbal meaning, but in connection with their development, their progression through the legislative body, the history of the times, prior legislation, [and] contemporary customs and conditions . . . . General expressions may be restrained by relevant circumstances showing a legislative intent that they be narrowed and used in a particular sense." *Commonwealth* v. *Welosky,* 276 Mass. 398, 401-402 (1931), cert. denied, 284 U.S. 684 (1932). *Murphy* v. *Bohn,* 377 Mass. 544, 548 (1979). *Chipman* v. *Massachusetts Bay Transp. Auth.,* 366 Mass. 253, 256 (1974). If a word or phrase has a technical or specialized meaning, this court will adopt that meaning in its construction of the statute. See *United States Jaycees* v. *Massachusetts Comm'n Against Discrimination,* 391 Mass. 594, 601 (1984); *School Comm. of Springfield* v. *Board of Educ.,* 362 Mass. 417, 439 (1972).

In the utility context, the words "light, heat or power" are used to describe the purposes of companies supplying electricity which is consumed by other products on the premises of the end user. When it used the words "electricity for light, heat or power purposes" in this statute, the Legislature intended that the *purposes* for which wires carrying electricity are used must be considered before it can be determined whether the examiners have the authority to regulate that use. Thus, it becomes evident that the Legislature intended to grant power to the examiners only over companies in the business of installing wires which carry or use electricity *as a product,* for light, heat or power purposes, but not over the infinitely broader spectrum of companies in the business of supplying other products that merely use electricity *as a source,* for light, heat or power. Alarm system installers do not install wires to carry electricity; they install wires to provide alarm systems. A majority of the Appeals Court concluded that "light," "heat," and "power" are "but varied manifestations of the same thing," deriving this observation from the legislative history of another

bill concerning electric utilities. *Simon* v. *State Examiners of Electricians, supra* at 23, quoting 1913 House Doc. No. 1925 at 14. However, this "same thing" is the product supplied by an electric company, not any product that happens to use electricity. In this context, the Legislature's use of the phrase "light, heat or power" was clearly one of limitation.

The statutory precursors of G. L. c. 141 also establish that the examiners' interpretation would render meaningless the words "for light, heat or power purposes" in G. L. c. 141, § 1. We have already noted that the Legislature originally used the words "light, heat or power" to define an electric utility in St. 1908, c. 529, § 1. Several years later, the Legislature consolidated the laws concerning those companies, and, in its new definition of an "electric company," described it as one "organized . . . for the purpose of making . . . and selling . . . electricity." St. 1914, c. 742, § 1. The limiting words in the previous definition — "only for light, heat or power" — were dropped in favor of the use of a single word, "electricity," which the Legislature apparently considered more general, more inclusive and more appropriate.[7] In addition, the Legislature's use of the word "only" in the 1908 statute substantially undermines the proposition that the words "light, heat or power" were considered by the Legislature to be general terms. Instead, it strongly suggests that a more limited grant of power to the examiners was envisioned by the framers of St. 1915, c. 296 (G. L. c. 141), than that which results from the examiners' view. In any event, there is no basis for disregarding in this case the principle that "wherever possible, no provision of a legislative enactment should be treated as superfluous." *Casa Loma, Inc.* v. *Alcoholic Beverages Control Comm'n,* 377 Mass. 231, 234 (1979). *Massachusetts Comm'n Against*

---

[7] The Legislature was aware that this court would be more likely to construe the new definition more broadly than the old, and would have been acting consistently with the principle that "a statutory expression of one thing is an implied exclusion of other things omitted from the statute." *Brady* v. *Brady,* 380 Mass. 480, 484 (1980), quoting *Harborview Residents' Comm., Inc.* v. *Quincy Hous. Auth.,* 368 Mass. 425, 432 (1975). See, e.g., *McArthur Bros.* v. *Commonwealth,* 197 Mass. 137, 139 (1908); *Commonwealth* v. *Berkshire Life Ins. Co.,* 98 Mass. 25, 29 (1867).

*Discrimination* v. *Liberty Mut. Ins. Co.,* 371 Mass. 186, 190-191 (1976).

2. *Subsequent legislative and administrative history.* Actions taken by both the examiners and the Legislature since 1915 support this interpretation. The history shows that the examiners themselves were unsure of the extent of their mandate.

At the outset, it should be recognized that while some respect is due the examiners' claim of authority under the statute (*White Dove, Inc.* v. *Director of the Div. of Marine Fisheries,* 380 Mass. 471, 477 [1980]), this case does not involve a contemporaneous and consistent administrative interpretation of the statute. Compare *Maria* v. *State Examiners of Electricians,* 365 Mass. 551, 552-555 (1974). See *School Comm. of Springfield* v. *Board of Educ.,* 362 Mass. 417, 441 n.22 (1972); *Cleary* v. *Cardullo's, Inc.,* 347 Mass. 337, 343-344 (1964).[8] Instead, the examiners apparently have never been convinced that regulations such as those involved here were within their statutory mandate. For example, in 1948, the examiners asked the Attorney General whether the wires and apparatus used in television installation constituted the use of "electricity for light, heat or power purposes." His opinion was that they did not. Rep. A.G., Pub. Doc. No. 12, at 22-23 (1949).[9] Furthermore, although it is undisputed that substantial use of alarm systems predates the 1915 statute, the examiners never attempted to regulate alarm system installers until 1969, at a time

---

[8] A majority of the Appeals Court panel considered the interpretation of a similar statute by the Board of Fire Prevention Regulations (board) to be evidence of a "consistent, long-standing administrative interpretation of the phrase." *Simon* v. *State Examiners of Electricians,* 18 Mass. App. Ct. 17, 25 (1984). That evidence is not persuasive, since the regulations promulgated by that board pursuant to G. L. c. 143, § 3L, are not coextensive with those in this case, and more importantly, that board has been granted a substantially broader mandate by the Legislature. *Id.* at 32 & n.5 (Rose, J., dissenting). See note 11, *infra.*

[9] The Attorney General did not rely on the exemption "for the transmission of intelligence," as provided in G. L. c. 141, § 7. He stated that such wires "are not installed or used for carrying or using 'electricity for light, heat or power purposes.'" Rep. A.G., Pub. Doc. No. 12, at 23 (1949).

when new systems were becoming less, not more, dangerous. As the Supreme Court has observed: "Authority actually granted by [the Legislature] of course cannot evaporate through lack of administrative exercise. But just as established practice may shed light on the extent of power conveyed by general statutory language, so the want of assertion of power by those who presumably would be alert to exercise it, is equally significant in determining whether such power was actually conferred." *FTC* v. *Bunte Bros.,* 312 U.S. 349, 352 (1941).[10]

In 1975, the examiners recommended to the Legislature a bill that would have amended G. L. c. 141, § 1, to grant express authority over businesses installing wires for carrying "electricity for light, heat or power purposes, *or any other purposes as governed in the rules and regulations of the board of fire prevention regulations*" (emphasis added). 1975 House Doc. No. 145. This amendment was deemed necessary by the examiners in order to "update" and to conduct "a general revision" of the law. 1975 House Doc. No. 144. Its passage would have been interpreted as a legislative approval of rule 2.2, which tracked the statutory language of § 1, but added "fire alarm and all signal work requiring the use of wire for transmission." This action by the examiners is a persuasive recognition that they were concerned that "light, heat or power purposes" was not a sufficiently broad grant of authority on which to base rule 2.2, and that the examiners therefore sought to extend their statutory mandate to include the same broad language and policy applicable to the Board of Fire Prevention Regulations.[11] The Legislature was apparently unconvinced that such an expansion of powers was in the public interest, since both branches accepted the report of the House Committee on Government Regulations, stating that the bill "ought not to pass." 1975 House Journal 843, 855 (1976). 1975 Senate Jour-

---

[10] The first sentence of this quotation was relied upon by the dissenting Justices, *infra* at 252.

[11] This broad grant of authority, contained in G. L. c. 148, § 28, is in distinct contrast to the enabling statutory language governing the examiners, as contained in G. L. c. 141, § 2.

nal 807 (1976). Similar bills have been introduced before and after that time; none has been enacted. See 1984 Sen. Doc. No. 542 (proposing "light, heat, power, *fire warning or security systems*"); 1983 Sen. Doc. No. 531 and 1984 Sen. Doc. No. 543 (proposing "light, heat or *current consuming purposes*"); 1983 Sen. Doc. No. 532 and 1984 Sen. Doc. No. 544 (proposing to *delete* phrase "light, heat or power purposes"); 1973 House Doc. No. 4143 (proposing "light, heat, power, *burglar alarm, fire alarm, sprinkler alarm, x-ray equipment, communications systems and signal systems*"). While postenactment history is not ordinarily considered as showing legislative disapproval of the rejected amendments (*Franklin* v. *Albert,* 381 Mass. 611, 616-617 [1980]), it is nevertheless relevant here, where the examiners have expressly stated that their proposed amendments constituted a "revision" of the statute, not merely a clarification of their authority.

Administrative interpretations are entitled to "a certain degree of weight, but they are not conclusive." *Russo* v. *Director of the Div. of Employment Sec.,* 377 Mass. 645, 649 (1979). Little weight is due the examiners' interpretation, since this legislative and administrative history casts serious doubt on the examiners' claim of authority here.

3. *Legislative policy.* One reason that the Legislature enacted St. 1915, c. 296 (now G. L. c. 141), was to protect the citizens of the Commonwealth from the significant danger posed by the transmission of electric current.[12] However, as noted above, this case does not involve the transmission of electricity in the utility context in which the Legislature intended the statute to apply.

There is also a substantial question on which the judge made no findings, namely, whether the low-voltage electricity used in alarm systems (or in television, telephone, or computer lines), poses a "significant danger." In fact, the likelihood of an accident or injury seems remote. It is agreed that none of the

---

[12] See also Rep. A.G., Pub. Doc. No. 12, at 69 (1974): "The principal aim of the section [one], and of c. 141 generally, appears to be the protection of those who deal with electricians."

parties to this case is aware of *any* instance of damage or injury caused by alarm system installation in this Commonwealth, even though the plaintiff installers in this case have been engaged in their occupation collectively for a total of 197 years. It is undisputed that alarm systems, on the whole, are becoming progressively safer, since newer systems can be efficiently powered by voltage so low that, even according to the examiners' expert witness, the intensity of a shock would be "slight." Even some bills that would have granted regulatory authority over this field to the examiners have distinguished between limited voltage alarm systems and high voltage electric power. See, e.g., 1984 Sen. Doc. No. 543; 1983 Sen. Doc. No. 531; 1973 House Doc. No. 4143. Given these circumstances, the examiners' interpretation is hardly mandated by the legislative policy.

4. *Conclusion.* The interpretation we adopt is neither an unreasonable construction of the statute nor an emasculation of the examiners' powers. It is stipulated that licensed electricians perform all "hard-wiring" in the installation of alarm systems, that is, they connect the alarm system wires with the live wires that supply the electricity which powers the system. Since "hard-wiring" involves installing wires that carry and supply electricity as an end product, it is well within the examiners' power to regulate. On the other hand, the installation of the component parts of an alarm system only involves supplying a product that uses electricity as a source of power.[13] Frequently, the installers merely insert a two-pronged plug into a wall receptacle that a licensed electrician has installed. If the examiners have the authority to regulate alarm system installers only because the system has wires that are connected to a source of electricity (often by a simple wall outlet),[14] the exam-

---

[13] The dissent incorrectly asserts that under our interpretation, only utility companies and their agents are subject to the examiners' authority. Those who install electrical wiring for light, heat and power systems are, in the words of the statute, installing wires "for light, heat or power purposes." The plaintiffs in this case are not installing light, heat or power systems.

[14] It is undisputed that the examiners have no authority over the installation or maintenance of wires that are not connected to a source of electricity.

iners have an equally persuasive claim of power over those who are in the business of supplying, delivering and installing such mundane items as washing machines, televisions, and toasters, since they, too, have wires that are connected to a source of electricity through a wall outlet.[15] There is nothing to suggest that the Legislature intended to grant electricians such a legal monopoly.

The duty of this court is to interpret the statute according to the intent of the Legislature and common sense. We are not simply to provide our imprimatur for regulations that the examiners might be able to defend on an excessively broad reading of the statute. This is especially true in the case now before us, where the statute is penal and must be as strictly construed as a criminal law. *Maria* v. *State Examiners of Electricians,* 365 Mass. 551, 554 (1974).

The examiners' interpretation of G. L. c. 141, § 1, is not supported by the language of the statute, the context from which it arose, any consistent administrative interpretation, or the legislative policy on which the statute is based. In other situations, we have not hesitated to reject administrative interpretations that violated the language and policy of the statute. See, e.g., *Cardin* v. *Royal Ins. Co.,* 394 Mass. 450, 456-457 (1985). We reject such an interpretation here, and affirm the judgment entered against the examiners in the Superior Court.

*Judgment affirmed.*


O'CONNOR, J. (dissenting, with whom Hennessey, C.J., joins). The plaintiffs' business involves the installation of electrical wiring connecting horns, sprinklers, alarm boxes, bells, and sirens to a control box, which in turn is connected to an electrical power supply. According to uncontradicted testimony

---

[15] The fact that alarm systems perform many sophisticated functions is irrelevant to this determination, since there is no indication that the Legislature intended to grant a broader scope of power over more sophisticated uses of electricity.

in the Superior Court, sophisticated modern alarm systems perform such functions as overriding elevator control systems, closing electromagnetic doors, and reversing air circulation systems. The purpose of the wiring installed by the plaintiffs is to transmit the electrical power required to sound the horns, bells, and sirens, and to activate the sprinklers and other protective devices. Yet, the court denies that the plaintiffs are "person[s], firm[s] or corporation[s] . . . engage[d] in . . . the business of installing wires . . . for carrying . . . electricity for . . . power purposes" within the meaning of G. L. c. 141, § 1 (1984 ed.). The court ignores the principle, to which it purports to adhere, *ante* 238, 242, (1985), that "[s]tatutory language is the principal source of insight into Legislative purpose." *Commonwealth* v. *Lightfoot*, 391 Mass. 718, 720 (1984). I would hold that the plaintiffs come within the meaning of G. L. c. 141, § 1, and that, because they are not "companies incorporated for the transmission of intelligence by electricity," they do not come within the exemption from c. 141, provided by c. 141, § 7. As a consequence, I would further hold, as did the Appeals Court, that Rule 2.2 of the Rules and Regulations of the Board of State Examiners of Electricians is a valid exercise of the examiners' rule making power granted by G. L. c. 141, § 2. Any concern of the court, no matter how legitimate it may be, that such a holding would grant electricians a legal monopoly, see *ante* at 249, does not justify the tortured construction that the court gives the plain language of the statute. If, through G. L. c. 141, § 1, the Legislature has granted electricians a monopoly, the Legislature may remedy that situation if it chooses to do so.

The court reasons that, since the Legislature originally used the words "light, heat or power" in legislation governing the sale of electric power by utilities, those words acquired "a specialized legislative meaning, relating to the sale of electric power by utilities." *Ante* at 242. The court speaks of "the utility context in which the Legislature intended the statute to apply," *ante* at 247, and of the Legislature's intent "to grant power to the examiners only over companies in the business of installing wires which carry or use electricity *as a product,*

for light, heat or power purposes, but not over the infinitely broader spectrum of companies in the business of supplying other products that merely use electricity *as a source*, for light, heat or power" (emphasis in original). Therefore, stating that "[a]larm system installers do not install wires to carry electricity; they install wires to provide alarm systems," *ante* at 243, the court concludes that G. L. c. 141, § 1, does not apply to the plaintiffs.

That reasoning seems to suggest that G. L. c. 141 applies only to those who install wires for the purpose of carrying electricity they have produced, i.e., utilities, and perhaps to their employees. Surely that was not the intent of the Legislature. If the court does not mean that, it must mean, at least, that G. L. c. 141 applies to those in the business of installing electrical wires so that a building will have electrical wiring, but not to those who install electrical wires only in connection with the installation of some other product, like an alarm system. The statutory language does not support such a distinction. Alarm installers install wires "for carrying electricity for . . . power purposes," and they get paid to install those wires. Therefore, despite the court's statement that "[a]larm system installers do not install wires to carry electricity; they install wires to provide alarm systems," *ante* at 243, alarm installers are persons "engaged in . . . the business of installing wires . . . for carrying . . . electricity for . . . power purposes" as provided by G. L. c. 141, § 1.

The court's decision is not justified by its expressed reluctance to interpret G. L. c. 141 in a way that would result in examiners' having authority to regulate "those who are in the business of supplying, delivering and installing such mundane items as washing machines, televisions, and toasters, since they, too, have wires that are connected to a source of electricity through a wall outlet." *Ante* at 249. The statute prohibits participation without a license in "the business of installing wires, conduits, apparatus, fixtures or other appliances for carrying or using electricity for light, heat or power purposes." Plugging an appliance into an outlet is not installation. Running wires between locations in a building, as is typical in burglar and

fire alarm systems, on the other hand, is installation. "[R]eason and common sense are not to be abandoned" when we interpret statutes. *van Dresser* v. *Firlings*, 305 Mass. 51, 53 (1940).

To bolster its conclusion, the court improperly relies on actions taken by the examiners since St. 1915, c. 296 (now G. L. c. 141), was enacted. Stating that, "in 1948, the examiners asked the Attorney General whether the wires and apparatus used in television installation constituted the use of 'electricity for light, heat or power purposes,'" *ante* at 245, and asserting that, in 1975, by introducing legislation designed to amend G. L. c. 141, § 1, the examiners demonstrated their concern that "'light, heat or power purposes'" was not broad enough to authorize rule 2.2, *ante* at 246, the court concludes that "the examiners apparently have never been convinced that regulations such as those involved here were within their statutory mandate." *Ante* at 245. By relying on those actions, the court unwisely ignores our previously expressed policy to "not draw the inference that the [agency] believed it was without the power requested from the fact that the legislation was introduced. Such an inference would be merely speculative and might serve to chill the agency's freedom to seek 'clarifying legislation on a genuinely debatable point of agency procedure . . . .' *Wong Yang Sung* v. *McGrath* [339 U.S. 33, 47-48, modified, 339 U.S. 908 (1950)]. Cf. *Commonwealth* v. *Woods Hole, Martha's Vineyard & Nantucket S.S. Auth.*, 352 Mass. 617, 619-620 (1967)." *Massachusetts Comm'n Against Discrimination* v. *Liberty Mut. Ins. Co.*, 371 Mass. 186, 194 (1976).

Similarly, the court's reliance on the examiners' failure to attempt to enforce regulations concerning the installation of alarms until 1969 does not help the court. It may be that advances in alarm technology or other considerations prompted the examiners to exercise that authority for the first time in 1969, but in any event, "[a]uthority actually granted by [the Legislature] . . . cannot evaporate through lack of administrative exercise." *FTC* v. *Bunte Bros.*, 312 U.S. 349, 352 (1941). See *Brooks* v. *Architectural Barriers Bd.*, 14 Mass. App. Ct. 584, 588-589 (1982). The examiners now purport to possess

the authority to regulate the installation of alarms, and that assertion of authority deserves respect. *White Dove, Inc.* v. *Director of the Div. of Marine Fisheries*, 380 Mass. 471, 477 (1980).

Just as the examiners' actions lend no support to the court, neither can the failure of recent Legislatures to adopt proposed amendments to G. L. c. 141 lend the court aid. The court infers from the Legislature's failure to enact several proposed bills that there has been legislative opposition to the examiners' having the authority they now claim. But that is not a valid inference. "[N]o one knows why the legislature did not pass the proposed measures. . . . The practicalities of the legislative process furnish many reasons for the lack of success of a measure other than legislative dislike for the principle involved in the legislation." *Irwin* v. *Ware*, 392 Mass. 745, 773 (1984), quoting *Berry* v. *Branner*, 245 Or. 307, 311 (1966). Furthermore, inquiry into the preference of Legislatures since 1915 is off the mark. The critical issue is what the Legislature that enacted the statute intended — not what subsequent Legislatures thought of proposed amendments to the statute. Failure of subsequent legislative bodies to adopt proposed amendments " 'has no persuasive significance' with reference to the intent of the Legislature which passed the original bill. *Devlin* v. *Commissioner of Correction*, 364 Mass. 435, 442-443 (1973). *United States* v. *Wise*, 370 U.S. 405, 411 (1962). '[T]he views of a subsequent [Legislature] form a hazardous basis for inferring the intent of an earlier one.' *United States* v. *Price*, 361 U.S. 304, 313 (1960). *Wong Yang Sung* v. *McGrath*, 339 U.S. 33, 47-48, modified, 339 U.S. 908 (1950). *Helvering* v. *Hallock*, 309 U.S. 106, 119-121 (1940)." *Massachusetts Comm'n Against Discrimination* v. *Liberty Mut. Ins. Co.*, *supra* at 193-194.

It is true, as the court states, that G. L. c. 141, § 5, renders G. L. c. 141 a penal statute, and that, for that reason, we must resolve in favor of criminal defendants any reasonable doubt about the statute's meaning. But the meaning of the statute is clear. The plaintiffs engage in the business of installing wires

to carry electricity for power purposes, and therefore they are required to be licensed and to otherwise comply with rule 2.2.

I would vacate the judgment entered in the Superior Court, and I would remand the case to that court for the entry of a judgment declaring valid rule 2.2, as codified in 237 Code Mass. Regs. § 4.02 (3) (1981), and declaring G. L. c. 141, § 7 (1984 ed.), inapplicable to the plaintiffs.