Fabricant, J.
INTRODUCTION
This action presents a facial challenge to certain regulations regarding requirements for teacher recer-tification. The plaintiff teachers’ organizations (“the teachers”) raise a set of statutory and constitutional challenges to the regulations, including claims based on the Education Reform Act, the public sector collective bargaining law, due process, and equal protection. Before the Court are the parties’ cross motions for summary judgment. For the reasons that will be explained, the plaintiffs’ motion will be denied, and the defendants’ motion will be allowed.
BACKGROUND
The parties have stipulated to the following factual and legal background. [1] Under G.L.c. 71, §38G, teachers in Massachusetts public schools must be licensed by the defendant Commissioner of Education (“the Commissioner”). Such a license indicates that the teacher has met the detailed training and competency standards adopted by the defendant Board of Education (“the board”). Licensure is the minimum legal requirement for a teacher to be employed in any public school district in Massachusetts. Massachusetts licensure, sometimes accompanied by other qualifications, may also entitle a teacher to obtain a teaching license in 41 other states, based upon reciprocity agreements authorized by statute.
The Education Reform Act (“the ERA,” or “the Act”), enacted by the Massachusetts Legislature on June 18, 1993, made certain changes in license requirements. The Act abolished the prior system of “permanent” teaching licenses, revocable only for cause. Under G.L.c. 71, §38G, as enacted in the ERA, a teacher must successfully compete a provisional licensing period, and then is eligible for a “standard certificate,” which must be renewed eveiy five years thereafter. As originally enacted, the ERA required each teacher “to maintain the development of professional skills and the knowledge of subject matter pertinent to the areas of certification.” It did not impose any requirement of individual professional development plans (“IPDP’s”), or of employer approval of such plans.
Soon after enactment of the ERA, on July 1, 1993, then Governor Weld filed proposed legislation that would have imposed additional requirements for teacher license renewals. The Governor’s bill would have required teachers to develop and successfully complete IPDP’s, and would have required employer approval of each teacher’s IPDP as a condition of license renewal.
The legislature enacted amendments to §38G in December 1993. The amendments imposed the requirement that each teacher complete an IPDP every five years as a condition of license renewal, but did not require employer approval of a teacher’s IPDP. Under §38G as amended, a teacher’s IPDP must meet “subject matter knowledge and teaching skill requirements set by the board,” and must “be designed to increase the ability of the person to improve student learning.” At the end of each five-year re-certification period the teacher must “attest to and provide appropriate supporting documentation to the state department of *802 education” that he or she has competed an IPDP that “meets the standards set by the board.”
The board first adopted regulations to implement §38G in December 1994. The 1994 regulations required teachers to accrue 120 “professional development points,” known as “PDPs,” over five years in order to renew their primary licenses. Renewal of additional licences required 30 additional points per license. To obtain license renewal, a teacher was required to submit an application directly to the Department of Education (“the department”), including a sworn statement that the teacher had acquired the requisite number of points based on an IPDP. The teacher was also required to maintain a log and other documentation of professional development activities, subject to audit by the department. The department’s Recertifi-cation Guide, first issued in September 1994, and then reissued in 1997, stated that “[t]he primary relationship in the recertification process is between the State and the individual educator. Activities or programs applied toward recertification must meet State standards for professional development.” The 1994 regulations did not require local school district approval of teachers’ professional development plans.
The first five-year renewal cycle under the ERA occurred in 1999. The department received approximately 77,633 recertification applications by the deadline of June 18, 1999. The department audited 859 of those applications by reviewing documentation of professional development activities submitted by teachers. Of those, the department requested additional documentation in about 50 cases. Of the 859 audited, the department approved 849. The department did not deny recertification in any case based on any judgment as to the quality of the professional development points or activities, or based on whether the teachers’ professional development activities were consistent with the needs or goals of the employing school or school district, nor did the department request or obtain school district professional development plans or individual school improvement plans. The department granted unaudited applications without review. The department’s expenditures on the 1999 recertifi-cation process, including conducting audits, amounted to less than five percent of the amount the department collected in application fees paid by teachers.
On October 26, 1999, the Board adopted new regulations, set forth at 603 C.M.R. §44 et seq., labeled by the parties in this case “the 1999 sign-off regulations.” These regulations are the subject of this action. The regulations recite, in §44.01, that “[t]he goal is for educators within a school and district to work together so that recertification achieves educational goals for the individual, the school, and the district, in order to assist students in meeting state learning standards.” The regulations apply to principals and other administrators as well as teachers.
In pursuit of the recited goal, the regulations provide, at §44.04(1), that “educators working in a Massachusetts public school must obtain approval of their proposed professional development plans from their supervisors,” and at §44.04(3), that such educators must “include in their recertification application their supervisor’s endorsement of their completed professional development plans.” Those employed in other than Massachusetts public schools are “encouraged to seek such approval,” and those not employed “shall submit their plans directly to the Department, without a supervisor’s endorsement.” Under §44.04(l)(a), approval “shall be from the educator’s direct supervisor. In most instances this will mean that the plans of teachers and other educators who report to the principal will be approved by the principal, a principal’s plan will be approved by the superintendent of schools, and a superintendent’s plan will be approved by the chairperson of the school committee.”
Under §44.04(l)(b), approval “shall be based on whether the 80% of the PDP’s in the plan that are subject to supervisor approval. . . are consistent with the educational needs of the school and/or district and whether the plan is designed to enhance the ability of the educator to improve student learning.” The 80% requirement refers to §44.06(2), which requires that “[a]t least 80% of the PDP’s earned after initial approval of an individual professional development plan must be in the content area of the educator’s primary certificate or in pedagogy directly related to instruction,” and that “[a]t least 60% . . . must be in the content area of the primary certificate.” In addition, pursuant to §44.04(l)(b), the supervisor “may consider whether the plan requires an educator to earn PDP’s regularly throughout the five year period when evaluating a plan.” Section 44.04(c) provides that approval “shall not be unreasonably withheld,” and establishes a process for review of denial. Teachers may seek review first from the superintendent and then from the Commissioner. No deadline appears for the Commissioner’s decision, which is “final” pursuant to §44.11.
Under §44.04(2), supervisors must review teachers’ plans at least every two years. Supervisors may require amendments to a previously approved plan, but may not withdraw approval of activities already undertaken pursuant to a previously approved plan. Under §44.04(3), the supervisor’s endorsement on the recer-tification application indicates that the educator’s records of completed professional development activities are consistent with the approved IPDP.
Massachusetts has approximately 330 school districts, with approximately 2000 school principals and other supervisors. These principals and supervisors are not employees of the department or members of the board. Under the 1999 regulations, these personnel have authority initially to review and approve or disapprove the professional development plans re *803 quired for some 88,300 teachers to obtain renewal of their state licenses. In October 2001, the department issued “Guidelines for Reviewing, Approving, and Endorsing Individual Professional Development Plans.” The guidelines set forth “Standards for Approval,” but do not require that principals apply the same level of scrutiny to all teachers’ plans.
As the regulations make clear, most of the contents of each teacher’s professional development plan must relate to the content area of the teacher’s license (e.g., mathematics or Spanish), rather than to teaching skills or methodology. The regulations allow all principals to approve content-specific professional development plans of teachers in all subject areas within their schools, regardless of their own training or expertise in content areas. The vast majority of principals are themselves certified in only one or two areas, in addition to their administrator certificates. Many hold only an administrator certificate and no content area license. For example, few, if any secondary school principals are licensed to teach foreign languages or art. Principals are allowed but not required to delegate approval of IPDPs to other supervisors, such as department heads. Board regulations specify subject matter competencies for obtaining licensure in each content area; in hiring teachers, principals rely on the board for assurance that applicants meet minimum state licensure qualifications. See 603 C.M.R. §7.11(2).
Under the ERA, school district foundation budgets include a three percent allocation for staff professional development. See G.L.c. 70, §§2, 3. Section 9 of G.L.c. 70 requires that any school district whose expenditures for professional development fall below the three percent allocation explain the shortfall to the department. School district financial reports filed with the department indicate that many school districts have failed to expend the required three percent on professional development since enactment of the ERA. The department has not regularly or routinely informed school districts of their obligation to explain shortfalls in expenditures on professional development, and has never required written explanation.
In each of fiscal years 1996 through 2000, the legislature appropriated funds earmarked for school district staff professional development, specifying an amount per pupil each year, and requiring that school districts report to the department on professional development activities funded. Financial reports submitted by school districts for those years indicate that substantial percentages of school districts failed to expend on professional development at the per pupil levels directed by the appropriations. The reports that the department has required of school districts for those years do not contain information about the subject matter, content, or format of professional development activities funded.
The ERA established a requirement that school districts adopt, implement, and annually update professional development plans for teachers and other staff; these plans are known as “school district professional development plans.” See G.L.c. 71, §38Q. In addition, the ERA requires that each school principal, in conjunction with the school council, produce a school improvement plan that addresses the school’s educational goals as well as staff professional development. See G.L.c. 71, §59C. The ERA requires the board to adopt an annual plan for providing statewide assistance in the preparation and implementation of school district professional development plans. The defendants prepared, approved, and disseminated to school districts statewide plans for professional development for fiscal years 1994, 1996, 1999, and 2001.[2]
In implementing the 1999 regulations, the defendants expect that individual teachers will align their IPDP’s with their school districts’ needs by referring to the needs and goals that are set forth in their school districts’ professional development plans, school building improvement plans, and/or school district improvement plans. Prior to promulgating the 1999 regulations, the defendants did not prepare or disseminate generally to school principals a model school improvement plan, and did not require school districts to submit copies of their annual school district professional development plans or their school improvement plans. The defendants had reviewed less than three percent of school district professional development plans and school improvement plans, did not rate any school district professional development plan for substance or quality, and evaluated only about 25 school improvement plans for quality. The defendants did not know whether the great majority of school district professional development plans and school improvement plans adequately set forth their school districts’ needs and goals or otherwise met the legislative purposes of G.L.c. 71, §§38Q and 59C. The defendants also did not know the extent to which teachers’ IPDP’s already were aligned with school district and school building needs and goals.
The board has authority under G.L.c. 69, §1B, to withhold state and federal funds from school districts that fail to comply with statutory or regulatory obligations. The Board has not withheld funds from any school district for failing to expend funds allocated for professional development, for failing to produce a school district professional development plan or school improvement plan, or for failing to explain shortfalls in expenditures on professional development.
Certain additional facts appear in affidavits submitted by the parties, and appended exhibits. Those set forth herein are uncontroverted in the materials submitted. No statute or regulation requires that school districts submit their professional development plans to the department, and most have not done so. No *804 statute or regulation prescribes the level of detail of such district plans. The department has provided information to school districts regarding the development of district plans through one half-day workshop, presentations in a series of conferences regarding teacher recertification, and a “Recertification On-Line Tour” on the department’s website. The department provides an on-line registry of professional development providers, as well as financial and spending guidelines for professional development. The department developed Statewide Professional Development Plans in 1994,1996, 1999, and 2001, each addressing new developments and initiatives from the department. In the years when it issued no new plan, the department continued to operate under the goals of the most recent plan. Since the implementation of the 1999 regulations, no teacher has appealed to the Commissioner from a supervisor’s refusal to approve an IPDP.
In October of 2001, the Department issued “Guidelines for Reviewing, Approving, and Endorsing Individual Professional Development Plans.” The guidelines set out a list of materials for the school district to provide teachers, including the district’s annual Professional Development Plan, the District Improvement Plan or School Improvement plan, and the Department’s Recertification Guidelines. The Guidelines go on to describe the role of the principal in approving individual plans, noting that the principal “may delegate this role to a department head.” The approval process, according to the guidelines, “should be fluid enough to allow educators to develop plans individually and collaboratively, receive initial feedback from supervisors, modify their plan (in mutually agreed upon ways), and submit their plan for formal approval.” Plans must include the required number of PDP’s at the time of initial approval, but “the PDP’s to be earned in the later years of the plan may be identified in a more general manner,” so as to allow “flexibilify to add professional development opportunities as they arise.” Supervisors may, according to the guidelines, ask teachers “to provide justification of the relevance of the proposed activities.”
The guidelines go on to provide that “Supervisors do not have authority to reject individual plans that are consistent with school and/or district goals and are designed to improve student learning.” Further, “A supervisor cannot reject a plan because in the supervisor’s opinion another activity would best meet the identified needs of the school or district. In other words, supervisors may not require an individual educator to participate in a specific professional development activity unless the activity is identified through collective bargaining. In addition, if the activities in an individual professional development plan are legitimately aligned with one school and/or district goal, the supervisor cannot reject the plan because the supervisor believes that the teacher should focus on another school and/or district goal.”
The guidelines also set timelines, as follows: “A supervisor must grant or deny approval of a plan within 30 days of receipt of the plan. Denial must be accompanied by a written explanation.” Denial or failure to act within 30 days triggers the right of review by local officials, who must grant or deny approval within 14 days. Denial or failure to act within that time by local officials triggers the right to seek additional review from the Commissioner. Upon such appeal, which must be brought within 30 days of denial, “the Commissioner or his designee will make a final, independent determination regarding plan approval,” based on whether the plan meets two standards: “The proposed activities in the plan are designed to improve student learning,” and “(t]he proposed activities in the plan are consistent with and aligned to school and/or district goals.” The guidelines, like the regulations, do not set a deadline for the Commissioner’s decision.
The teachers filed this action in February of 2000. Their complaint challenges the regulations on their face, setting forth seven theories in seven numbered counts. Count I alleges that the regulations conflict with G.L.c. 69, §1B, and G.L.c. 71, §38G, in that they “effectively put the employer in control of the licensure relationship.” Count II alleges that the regulations “constitute an unlawful subdelegation of discretionary authority” to school principals and supervisors. Count III alleges that the regulations exceed the defendants’ authority in that §38G authorizes “uniform, statewide minimum standards of competency for educator licen-sure and license renewal.” Count IV alleges that the regulations violate the due process provisions of the Massachusetts and federal constitutions, in that “the standards governing the exercise of the employer’s discretion are vague and cannot be applied consistently either within or among school districts,” and the appeal procedures provided by the regulations “contain no adequate standards” and “no meaningful time frame” for review of the principal’s decision. Count v. alleges that the regulations deprive teachers of equal protection of the law “because the standards governing the exercise of the employer’s discretion cannot be applied consistently either within or among school districts,” and “are not rationally related to the statewide licensing standards and system implemented by Section 38G.” Count VI alleges that the regulations conflict with the public sector collective bargaining law, G.L.c. 150E, and related Sections of G.L.c. 71, in that “those statutes ordain collective bargaining over teacher’s working conditions, including evaluation procedures, performance standards, and employer-directed professional development activities.”
Count VII, finally, alleges that the regulations are arbitrary and capricious. The complaint seeks a declaration that the regulations are invalid, and an injunction barring their enforcement.
Defendants answered the complaint on March 14, 2000, and soon thereafter moved for judgment on the *805 pleadings. On April 9, 2001, the Court (Lopez, J.) denied the motion with respect to counts I through v. and VII, expressing the view that the regulations appeared vulnerable on various grounds, but allowed the motion with respect to Count VI, concluding as a matter of law that the regulations do not violate any collective bargaining rights of the teachers.[3] Thus, six counts of the complaint remain for adjudication on the present cross motions for summary judgment.
DISCUSSION
Summary judgment should be granted where it appears from the pleadings and evidentiary materials offered that there are no.genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. See Somerset Sav. Bank v. Chicago Title Ins. Co., 420 Mass. 422, 426 (1995); Cassesso v. Comm’r of Correction, 390 Mass. 419, 422 (1983); Community Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976). Summary judgment is a device “to make possible the prompt disposition of controversies on their merits without a trial, if in essence, there is no real dispute as to the salient facts or if only a question of law is involved.” Id. at 554. Here, the record establishes that all facts material to the issues presented are undisputed. The issues raised by the present cross-motions are solely issues of law.
The issues presented here are closely related to those litigated between the same parties, and decided by the Supreme Judicial Court in favor of the defendants, in Massachusetts Federation of Teachers v. Board of Education, 436 Mass. 763 (2002) (“MFTI’). In issue there were regulations requiring, as a condition of recertification, that math teachers in schools with low performing math programs take math assessment tests, with each teacher’s test results used in developing or revising the teacher’s IPDP. The regulations in issue there, like those challenged here, condition re-certification on compliance with requirements that vary with the school and district in which the teacher is employed. In that case, as here, the teachers asserted a facial challenge to the regulations, offering virtually the same arguments they make here. The SJC rejected each.[4]
The SJC recited the applicable standard in MFTI as follows:
A highly deferential standard of review governs a facial challenge to regulations promulgated by a government agency ... A properly promulgated regulation has the force of law . . . and must be accorded all the deference due to a statute ... A party challenging the validity of a regulation must prove that the regulations is illegal, arbitrary, or capricious . . . Such plaintiff must establish the absence of any conceivable grounds upon which [the rule] may be upheld . . . That burden cannot be carried by arguing that the record does not affirmatively show facts which support the regulation . . . Rather, we must apply all rational presumptions in favor of the validity of the administrative action and not declare it void unless its provisions cannot by any reasonable construction be interpreted in harmony with the legislative mandate . . .
In reviewing a regulation, a court cannot substitute [its] judgment as to the need for a regulation, or the propriety of the means chosen to implement the statutory goals, for that of the agency, so long as the regulation is rationally related to those goals ...
An agency’s powers to promulgate regulations are shaped by its organic statute taken as a whole and need not necessarily be traced to specific words . .. When the Legislature delegates to an administrative agency a broad grant of authority to implement a program of reform or social welfare, the administrative agency generally has a wide range of discretion in establishing the parameters of its authority pursuant to the enabling legislation . . . Where the focus of a statutory enactment is reform, the administrative agency charged with its implementation should construe it broadly so as to further the goals of such reform.
Id. at 771-74 (internal citations and quotations omitted).
The Education Reform Act, the Court observed, was intended “to reform public education” by “establishing and achieving specific educational performance goals for every child,” and by “holding educators accountable for their achievement.” In furtherance of that goal, “the Legislature gave the board broad authority,” among other things, to “establish the standards for certifying public school teachers in accordance with G.L.c. 71, §38G.” Id. at 774 (internal citations omitted). The regulations in issue in that case, the Court held, were a valid exercise of that authority. Id. at 775. The Court further held that the regulations were not arbitrary and capricious, did not violate equal protection or due process rights, and did not violate the collective bargaining law. Id. at 776-83. The SJC’s decision in MFTI resolves each of the issues presented here.
1. Counts I and III: Ultra Vires
Counts I and III allege that the regulations conflict with G.L.c. 69, §1B, and G.L.c. 71, §38G, in that they “effectively put the employer in control of the licensure relationship,” and fail to establish “uniform, statewide minimum standards of competency.” The teachers’ arguments in support of this theory are notably imprecise as to the particular statutory language on which they rely; their theme, as a general matter, appears to be that these statutory provisions require the board to govern certification in a uniform manner statewide, and do not permit any involvement at the local level.
As construed in MFTI, G.L.c. 69, §1B, grants the board “broad authority to establish such policies as *806 are necessary to fulfill the purposes of the Act and to promulgate regulations that encourage innovation, flexibility, and accountability in schools and school districts.” Id. at 766. The provision of the section of most relevance here is the third paragraph, which provides in pertinent part that “the board shall establish standards for certifying all teachers ... as provided in and subject to Section thirty-eight G of chapter seventy-one.” The latter statute provides, in its twenty-second paragraph, as follows: “Each standard educator certificate shall be valid for five years and continued every five years thereafter upon the successful completion of an individual professional development plan that meets the subject matter knowledge and teaching skill requirements set by the board. Such plan shall be designed to increase the ability of the person to improve student learning.”[5]
Nothing in either statute expressly prohibits local involvement in the recertification process, or in the development or approval of IPDP’s. Rather, the statute directs the board to set standards, specifically “knowledge and teaching skill requirements,” and grants the board broad discretion with respect to both the content of the standards and the process for their implementation. The record presented here leaves no doubt that the board has set a standard, in fulfillment of its statutory duty. The standard, as set by the board, is expressed in the regulations themselves and elaborated in the guidelines published by the Board. The standard is twofold: each teacher’s professional development activities must be designed to improve student learning, and must be consistent with and aligned to school and/or district goals.
The method the defendants have chosen for implementing this standard is plainly rational. Each teacher’s principal, or that person’s designee, is in the best position, certainly far better than the department in the first instance, to be familiar with school and district goals, as well as with the individual teacher’s professional development needs, and to determine whether a teacher’s plan meets the standard as set by the board. Nevertheless, the regulations do not, as the plaintiffs suggest, put the employer in control of recertification. The board retains ultimate control through the appeal process, which authorizes the Commissioner to overrule any supervisors’ denial of a teacher’s plan, based on a de novo determination of whether it meets the standard.
The plaintiffs point to the legislature’s rejection of Governor Weld’s 1993 proposed amendment, which would have imposed a local sign-off requirement by statute. The SJC rejected a virtually identical argument based on rejected legislation in MFTI. The Court noted, “no inference is possible from this negative history ... The practicalities of the legislative process furnish many reasons for the lack of success of a measure other than legislative dislike for the principle involved in the legislation.’ ” 436 Mass. at 763, quoting Franklin v. Albert, 381 Mass. 611, 615-16 (1980). Here, an alternative explanation is apparent; the legislature may have preferred to leave the issue of sign-off to the discretion of the board.
The plaintiffs suggest that the board’s earlier regulations, which did not include a local sign-off requirement, imply a view on its part that its discretion does not include imposing such a requirement. For this they rely on Simon v. State Examiners of Electricians, 395 Mass. 238, 245-46 (1985). The issue in that case was whether installation of alarm systems fell within the regulatoiy authority of the defendant board, under a decades old statute that referred to electricity “for light, heat or power purposes.” In that context the Court considered the board’s historical lack of regulation of alarm systems as one of many factors bearing on interpretation of the statute. Here, there is no question that the board has authority to establish by regulation requirements for recertification. That it chose in 1999 to impose requirements that it did not chose to impose in 1994 sheds no light on the scope of its authority.
The plaintiffs argue that the regulations do not provide “uniform statewide standards” for license renewal. They point to no place in the governing statutes where the quoted phrase appears. The statute, G.L.c. 71, §38G, refers to “individual professional development plans.” Such plans are, by definition, individual. Uniformity would contradict the statutory language, not serve its mandate. The statute plainly envisions that individual plans will be tailored to the circumstances of the individual teacher. The regulations serve that goal by requiring that each teacher identify his or her professional development needs in consultation with the teacher’s supervisor, taking into account the needs and objectives of the school and district in which the teacher works. The standards established in the regulations are the same for all teachers in the Commonwealth; all are required to develop individual plans, in consultation with their supervisors, and to tailor their plans to the needs of their schools and districts.
The plaintiffs attempt to distinguish MFTIby pointing out that the math assessment tests in issue there are uniform statewide; everyone who is subject to the testing requirement takes the samé test, scored against the same objective standard. The argument downplays a crucial fact: under the regulations upheld in that case, imposition of the testing requirement on any particular teacher depends on the performance of the school and district in which the teacher teaches, rather than on any characteristic or achievement of the individual teacher. The SJC has thus construed the statutory scheme as permitting the board, in the exercise of its broad discretion, to impose recertification requirements that vary depending on local characteristics. That is exactly what the regulations in issue here do.
*807 The plaintiffs argue that the regulations are not “necessary” to carry out the statutory purposes, and therefore not authorized by G.L.c. 71, c. 38G, see MFT I, 436 Mass. at 773, because the statutory scheme provides other means of ensuring that teachers use their IPDP’s to address the needs of their schools. They cite, in particular, the board’s authority to monitor school district professional development plans and expenditures, and the school districts’ authority to impose professional development requirements on employees.[6] The teachers point to various claimed deficiencies in the efforts of school districts to provide professional development programs, and in the board’s monitoring of such efforts. “If the system had been implemented as designed,” they argue, “school districts would have been offering teachers high quality PD programs targeting school district needs and teachers would have been using these PD programs to fulfill their license renewal requirements.”
The argument ignores the standard applicable to a facial challenge. As the SJC observed in MFT I, “(i]n reviewing a regulation, a court cannot substitute [its] judgment as to the need for a regulation, or the propriety of the means chosen to implement the statutory goals, for that of the agency, so long as the regulation is rationally related to those goals.” 436 Mass. at 772. It is the agency’s judgment of necessity, not that of the Court, that controls. Whatever deficiencies may exist in the professional development efforts of school districts or the board’s monitoring of them have no bearing on the board’s discretion to determine standards and procedures for recertification.
2.Count II: Delegation
Count II alleges that the regulations unlawfully delegate the defendants’ statutory authority to local officials. This count fails for essentially the same reasons as Count I. The regulations do not delegate authority to establish standards; the board has established the standards, and has reserved to itself ultimate authority for their application in any particular case. What has been delegated is authority for initial application of the standards at the local level, subject to review at the state level. Nothing in the statute prohibits such delegation. See generally, Commonwealth v. Smigliano, 427 Mass. 490, 494 (1998) (approving delegation by Secretary of Public Safety to Criminal Justice Training Council of function of certifying operators of breath test devices, under supervision of Secretary).
3.Count IV: Due Process
Count IV alleges that the regulations violate due process. The complaint alleges that the “standards governing the exercise of the employer’s discretion are vague and cannot be applied consistently either within or among school districts,” that the appeal procedures “contain no adequate standards,” and that the regulations establish no time limit for the Commissioner’s decision on review of a principal’s denial.
The vagueness theory is indistinguishable from a claim the teachers asserted in MFT I, directed at a provision authorizing waiver of the testing requirement for teachers who demonstrated mastery or under other unspecified special circumstances. The SJC observed,
A vagueness challenge is usually raised in an effort to invalidate a criminal statute . . . While civil laws are subject to judicial scrutiny for vagueness, the degree of vagueness that is constitutionally permissible varies with the interests involved . . . The test is less strict when the law involves the regulation of business and economic activity and does not inhibit the exercise of constitutionally protected rights ... Flexibility in a statute is necessary to respond to individual factual situations ... Moreover, ambiguities, especially in regulations affecting business, may be clarified by resort to the administrative process so as to cure a vagueness claim.
The individual interests of teachers that may be affected by the challenged regulations are economic in nature, namely the conditions on the right to practice their profession. The regulations do not forbid any behavior by teachers . . . The provisions of [the regulation], and the statutes that gave the board the authority to promulgate it, clearly inform teachers of their professional responsibilities and obligations.
436 Mass. at 780-81 (internal citations and quotations omitted). On that basis, the SJC held that the regulations in issue there, including the waiver provision, did not violate due process.
The same reasoning applies here. The interest affected is the samethat is, the teachers’ economic interest in the right to practice their profession. The regulations impose no prohibition or penalty, but only a condition on renewal of licensure. They establish a standard, albeit a flexible one subject to the exercise of judgment in application “on a case by case basis.” Id. at 781. Due process does not prohibit such flexibility. See Id.
As to the absence of a deadline for the Commissioner’s decision on review, the standard for a facial challenge bears repeating. The plaintiffs must show that the regulations could never be applied in a lawful manner. See Dowell v. Department of Transitional Assistance, 424 Mass. 610, 615 (1997). The plaintiffs’ argument assumes that the Commissioner will not act on appeals with reasonable promptness. The Court cannot make that assumption; on a facial challenge, the Court must assume the contrary. Should the Commissioner fail to decide with reasonable promptness in a particular case, an as applied challenge will provide redress.
4.Count V: Equal Protection
Count v. alleges that the regulations deprive teachers of equal protection because “the standards governing the exercise of the employer’s discretion cannot be *808 applied consistently either within or among school districts,” and “are not rationally related to the statewide licensing standards and system implemented by Section 38G.” This claim, as presented, is essentially a recast of the vagueness argument, which must be rejected for the reasons already stated. The regulations make no classification among teachers, based on membership in any suspect class or otherwise, nor do the regulations infringe on any fundamental personal rights. See MFT I, 436 Mass. at 777. Under the regulations all teachers, in all schools and school districts, must obtain their supervisors’ approval of their IPDP’s, based on the same standards and subject to the same reviewprocedure. To meet those standards, each teacher must tailor his or her 1PDP to the needs and plans of his or her own school and district; in that sense, teachers’ obligations vary by school and district. The rational basis for that variation is plainly apparent; such tailoring serves to promote the ability of each school’s faculty to meet the needs of that school’s students.
5. Count VI: Collective Bargaining
Count VI alleges that the regulations conflict with the public sector collective bargaining law, G.L.c. 150E, and related Sections of G.L.c. 71, in that “those statutes ordain collective bargaining over teacher’s working conditions, including evaluation procedures, performance standards, and employer-directed professional development activities.” Here again, the plaintiffs made the same argument, unsuccessfully, in MFTI. As the SJC observed there, “(t]he focus of the collective bargaining law is the employment relationship between teachers and their school districts,” including, pursuant to G.L.c. 71, §38, procedures for performance evaluations. 436 Mass. at 781. The employment relationship, the Court held, was not affected by the regulations in issue in that case; rather, “[t]he challenged regulations govern teacher recertification which relates to the relationship between individual teachers and the Commonwealth.” Id.
The same is true here. The regulations challenged here do not address any aspect of the employment relationship. They neither mandate nor authorize any employment based sanction or reward for a teacher’s conduct with respect to an IPDP, or for a supervisor’s approval or disapproval. Nor do they dictate any action with respect to performance evaluations, local professional development requirements, or local performance standards. Rather, the regulations relate solely to the requirements for recertification, a matter indisputably outside the realm of collective bargaining, and within the authority of the defendants. No conflict exists between the regulations and the collective bargaining law.
6. Count VII: Arbitrary and Capricious
Count VII alleges that the regulations are arbitrary and capricious, in that the sign-off requirement will subject teachers to varied levels of scrutiny depending on the whims of individual supervisors, or the relationships between individual teachers and their supervisors. This claim is closely related to the due process and equal protection theories discussed supra, and must be rejected for essentially the same reasons. The theory assumes that principals will act inconsistently, and that de novo review by the commissioner will fail to correct such inconsistency. The Court cannot make that assumption in the context of a facial challenge. The Court must assume proper conduct on the part of all the public officials involved in the implementation of the regulations. On that assumption, no arbitrariness appears. Should inconsistent application occur in practice, and affect individual teachers, an as applied challenge will provide redress.[7]
CONCLUSION AND ORDER
For the reasons stated, the Defendants’ Motion for Summary Judgment is ALLOWED, and the Plaintiffs’ Cross Motion for Summary Judgment is DENIED. It is hereby ordered that JUDGMENT enter declaring as follows:
The regulations promulgated by the Board of Education in 1999, published at 603 C.M.R. §44 et seq., regarding supervisor approval of teachers’ individual professional development plans, known as the “1999 sign-off regulations,” are a lawful exercise of the statutory authority of the board, do not violate any constitutional or statutory provision, and are not arbitrary and capricious.

Some of the stipulated facts have no apparent bearing on the issues presented. The Court nevertheless recites them for completeness.

The stipulation of the parties is dated June 27, 2002.

Despite that ruling, both sides address the collective bargaining issue in their motion papers. The Court will accordingly discuss the issue briefly.

The SJC noted with apparent approval, but did not directly address, the particular regulatory requirements that are the subject of this case. 436 Mass. at 769 (“In accordance with G.L.c. 71, §38G, licensed public school teachers must have their proposed professional development plans approved by their supervisors pursuant to specific timelines . . . The plan of any math teacher in a low-performing mathematics program will not be approved or endorsed by a supervisor until that teacher takes the assessment test... In evaluating whether a professional development plan is ‘consistent with the educational needs of the school and/or district and whether the plan is designed to enhance the ability of the educator to improve student learning,’ a supervisor must determine that the plan addresses weaknesses identified by the assessment test”).

A 2002 amendment, effect July 1, 2003, added the requirement that “At the end of each five-year period each standard educator shall attest to and provide appropriate supporting evidence and documentation to the state department of education, in such form and at such time as the commissioner shall prescribe, that the educator has successfully completed a professional development plan which meets the standards set by the board."

Such imposition, the teachers contend, would be a mandatory subject of collective bargaining.

It is noteworthy that no such case has occurred in the nearly four years the regulations have been in effect.